**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Bernardino ACEVEDO, Defendant-Appellant.**

No. 79–2016.

United States Court of Appeals, Seventh Circuit.

Argued May 2, 1980.

Decided Aug. 5, 1980.

Rehearing Denied Sept. 3, 1980.

William H. Kampenga, Oak Lawn, Ill., for defendant-appellant.

Thomas P. Sullivan, U. S. Atty., Kevin E. Sharkey, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before SPRECHER and WOOD, Circuit Judges, and EAST, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

On February 23, 1979, agents of the Drug Enforcement Administration forcibly entered Bernardino Acevedo's apartment without a warrant and therein arrested him. On April 15, 1980, the United States Supreme Court held violative of the fourth amendment warrantless nonconsensual entries to effect in-home arrests in the ab-

* Senior Judge William G. East, United States District Court for the District of Oregon, is sitting by designation.

sence of exigent circumstances. *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Consequently, the issue we face is whether the agents entered Acevedo's apartment under circumstances that may properly be characterized as exigent, that is, requiring immediate action.

Agents Kenneth Adams and Patricia Collins, working undercover, met with Acevedo's associate, Luis Ramos, on February 13, 1979, to negotiate a heroin purchase. At Ramos' insistence, the agents drove Ramos to a parking lot next to a tavern on the north side of Chicago. Ramos then left the agents' auto and walked towards two adjacent row-type buildings, one of which housed the tavern. Ten minutes later, Ramos returned with an ounce of heroin, which he sold to the agents for $820. On February 22, the agents again met Ramos, this time to negotiate purchase of a pound of heroin. Ramos indicated he could not secure such a large quantity until the following afternoon but that his source had an ounce available for immediate sale. The agents and Ramos then drove to the parking lot where they had transacted business the previous week. As before, Ramos left the car, walked towards the buildings, and returned shortly with the heroin, for which the agents paid him $825. On this occasion, however, another agent observed Ramos leaving the building immediately adjacent to the tavern.

On February 23, 1979, the date of the challenged arrest, the agents met Ramos to close the deal on the pound of heroin. Ramos informed them that his source had only ten ounces available for sale. The agents agreed to purchase that quantity and once again at Ramos' direction drove to the tavern parking lot. Ramos then entered the tavern, returning a short time later to report that his source was not at his residence. Twenty minutes later, Ramos and agents Adams and Collins entered the tavern, whereupon Ramos contacted his source by telephone. Acevedo shortly arrived at the building adjacent to the tavern. Ramos then directed the agents to return to their car while Ramos entered the first floor apartment and therein met Acevedo. After a short conversation with Acevedo, Ramos returned to the parking lot and informed the agents that his source had only three or four ounces available at the moment but would have six more ounces available two hours later. The agents agreed to the immediate purchase of four ounces, whereupon Ramos returned to the first floor apartment. When Ramos arrived, a surveillance agent located off a gangway separating the tavern from the apartments observed through a window that Acevedo removed a small package from a table and handed it to Ramos.[1] Ramos then returned to the parking lot, exchanged approximately four ounces of heroin for $3,200, and was arrested.

1. Appellant contends this observation was itself violative of the fourth amendment as intruding on his reasonable expectation of privacy. It is well-settled that observations made by law enforcement officials from the common areas of multi-unit dwellings ordinarily do not violate a resident's reasonable expectation of privacy. *See, e. g., United States v. Penco*, 612 F.2d 19 (2d Cir. 1979); *United States v. Shima*, 545 F.2d 1026 (5th Cir.), *cert. denied*, 434 U.S. 996, 98 S.Ct. 632, 54 L.Ed.2d 490 (1977). The district court here found the gangway was not a private entryway but was instead open to the public, a finding we accept as not clearly erroneous. The doors at either end of the gangway were unlocked. Furthermore, the bare concrete floor, the absence of light and heat, and its location immediately next to the tavern, suggest its use as a public passageway separating the tavern from the adjacent apartments.

The observations made from this vantage therefore did not infringe Acevedo's privacy interest.

Appellant further contends that even if his privacy interest did not extend to the gangway, one of the agents violated his expectation of privacy by peering into his apartment through a window that was partially covered by contact paper. The agent was able to see into the apartment because of a large hole in the contact paper. Since the contact paper was on the inside of the window, the agent clearly did not tear it. More likely, a tenant tore the contact paper to view the activities occurring in the gangway. Being used for that purpose and not having been subsequently covered when it so easily could have been, that inside tear indicates Acevedo no longer had an expectation that those who passed the window refrain from looking in.

At the scene of and immediately after the arrest, Ramos informed the agents that his source was in the first floor apartment of the building adjacent to the tavern. Six agents, accompanied by Ramos, then converged on that apartment, knocked, announced their office, and upon receiving no response, forced the door open. Inside, the lights were on, and a video tape machine was playing, but Acevedo was nowhere to be found. Ramos suggested he was in the second floor apartment from which he had recently moved. After again knocking on the door of that apartment, announcing their office, and receiving no response, the agents forcibly entered. Inside they discovered Acevedo hiding in a closet and arrested him.

A grand jury charged Acevedo with distribution of approximately four ounces of a mixture containing heroin, a Schedule I substance, in violation of 21 U.S.C. § 841(a)(1). At a pretrial suppression hearing, the district court ruled several items of physical evidence and certain post-arrest statements were admissible as incident to a lawful arrest. Subsequently, the district court found Acevedo guilty as charged and sentenced him to three years imprisonment and three years parole. Acevedo appeals the district court's finding that the arrest, though executed after a forcible entry into his home without a warrant, was lawful as a response to exigent circumstances.

■ In *Dorman v. United States*, 435 F.2d 385 (D.C.Cir.1970), the District of Columbia Circuit, anticipating by a decade the *Payton* result, identified a number of factors relevant to the determination whether exigent circumstances justify warrantless entry of a suspect's home to effect a felony arrest.[2] Although some or all of the factors listed in the margin may be relevant to a particular case, the limitless array of factual settings that may arise caution against a checklist-type analysis. *See United States*

*v. Adams*, 621 F.2d 41, at 44 (1st Cir. 1980). *Dorman* better serves as a guide to resolution of the underlying pragmatic question whether the exceedingly strong privacy interest in one's residence is outweighed by the risk that delay will engender injury, destruction of evidence, or escape. Since the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," *United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972), those asserting the propriety of their entry bear a heavy burden of showing they had an urgent need to cross the threshold without a warrant.

■ The Government met that burden in this case. There was a clear showing of probable cause that Acevedo had engaged in the distribution of heroin and that he was on the premises at the time of entry. On two previous occasions, Ramos had delivered heroin to the agents after emerging from or near the building in which this latest transaction occurred. On the day of the arrest, Ramos informed the agents that his source was not at home but would be arriving soon. A few minutes later, the agents observed Acevedo entering the gangway that separated the tavern from a small apartment building. Ramos followed immediately. Through a window off the gangway, an agent observed Ramos and Acevedo conversing and that no one else was present in the apartment. After informing the agents of the terms of the sale, Ramos returned to the apartment, presumably to secure the heroin. An agent, again peering through the window, observed Acevedo handing a small item to Ramos. Ramos then delivered to the agents a packet containing approximately four ounces of heroin. Since the earlier transactions had revealed only the apartment building from which Ramos likely secured heroin, the moment of delivery following on the heels of

---

2. (1) Whether the suspect was accused of a "grave offense," particularly a crime of violence; (2) whether the arresting officer reasonably believed the suspect was armed; (3) whether there was a "clear showing" of probable cause; (4) whether the arresting officer had a strong reason to believe the suspect was on the premises; (5) whether the suspect was likely to escape if not immediately apprehended; (6) whether the entry was peaceful; and (7) whether the entry was made during daylight hours. 435 F.2d at 392–93.

the observations of the Ramos-Acevedo interchange and exchange was the moment at which the agents first had probable cause to believe Acevedo was dealing in heroin and accordingly was the first time they were in a position legally to secure a warrant. The factual position in which the agents found themselves is another matter. Upon taking Ramos into custody, the agents faced a serious risk that Acevedo would escape during the time necessary to secure a warrant.[3] Ramos' failure to return with the proceeds of the transaction might have tipped Acevedo that Ramos had been arrested and that his arrest was imminent. *See United States v. Kulcsar*, 586 F.2d 1283, 1287 (8th Cir. 1978). Furthermore, upon Ramos' arrest, other agents on the scene who were not yet aware of the precise site of the transactions raced with their guns drawn to an area behind the two buildings. The agents' conspicuousness, which the district court found was a reasonable protective response, likely caused Acevedo to become aware that he might be arrested.

The agents' ability to protect against Acevedo's escape was limited by their incomplete knowledge of the layout of the building that they had just discovered housed Acevedo. Despite their numbers, they could not be reasonably certain that their coverage of the known exits was sufficient to prevent Acevedo's escape. Nor was there sufficient time to discover and secure any unknown exists that Acevedo might use to escape. Under these circumstances, the agents faced the choice, through no fault of their own,[4] of acting immediately to enter and arrest Acevedo without a warrant or risking not being in a position again to arrest him. Upon making the determination that immediate action was necessary, the agents knocked and announced their office, indicating their intention to enter peaceably. Failing after a reasonable time to receive a response, the agents entered. That entry, we hold, was reasonable. Accordingly, the arrest was lawful and the items seized incident thereto were properly admitted.

AFFIRMED.

---

**3.** Since Ramos had informed the agents that his source had only four ounces of heroin available, which was the quantity delivered immediately before the arrest, the district court quite properly refused to rest its finding of exigency on the risk of destruction of evidence. The district court also found that the officers had no reason to believe Acevedo was armed other than their general concern that those engaged in heroin trafficking often carry dangerous weapons.

**4.** The plan to arrest Ramos' source had been laid that morning. At that time the agents, aware of neither Acevedo's identity nor his precise location, were certainly not in a position to secure a warrant. The agents discovered these critical facts at about the same time Acevedo became aware of their presence. *Compare United States v. Berkwitt*, 619 F.2d 649, at 653–654 (7th Cir. 1080), *with United States v. Rosselli*, 506 F.2d 627, 629–30 (7th Cir. 1974).