849 F.2d 607
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Benjamin MADUKA, Defendant-Appellant.
 No. 87-5594.
 United States Court of Appeals, Fourth Circuit.
 Argued: Jan. 8, 1988.
Decided: June 9, 1988.
 
 Stephen Jon Cribari, Deputy Federal Public Defender; Stephanie Batcheller, Assistant Federal Public Defender (Fred Warren Bennett, Federal Public Defender; Susan M. Bauer, Assistant Federal Public Defender; Angela Wilkins, Paralegal; Maureen Glancy, Law Clerk, on brief), for appellant.
 John Vincent Geise, Assistant United States Attorney (Breckinridge L. Willcox, United States Attorney, on brief), for appellee.
 Before MURNAGHAN and SPROUSE, Circuit Judges, and JOSEPH H. YOUNG, United States District Judge for the District of Maryland, sitting by designation.
 SPROUSE, Circuit Judge:
 
 
 1
 Benjamin Maduka appeals his conviction after a jury trial of numerous offenses relating to the possession and distribution of heroin.[1] He contends the district court erred in failing to suppress evidence discovered during his warrantless arrest. Maduka, who is black, also argues he is entitled to a new trial because the Government's use of peremptory challenges to strike two black potential jurors violated his right to equal protection of law. We affirm.
 
 I.
 
 2
 In December 1986 a United States Customs Service agent contacted a special agent of the Drug Enforcement Administration (DEA) in Baltimore, Maryland, to inform him of a tip the Customs Service had received concerning the arrival in Baltimore of heroin from Nigeria. The tip came from an informant, Felix Umah, who had provided accurate information in several prior heroin investigations.[2] Umah reported that a Nigerian named Okoh had offered to sell him six to seven ounces of heroin.
 
 
 3
 On December 10, 1986, Umah made a telephone call to Okoh, which the DEA monitored and tape-recorded. During the call Okoh stated that his source would arrive in town the next day, December 11th. Okoh and Umah scheduled a meeting for noon on December 11th to discuss the possibility of making a deal. The meeting was to include Okoh, Umah, and Umah's buyers; the buyers were to be undercover DEA agents. Okoh called Umah the next day, before the scheduled meeting, and informed him that the source, who was flying to Baltimore from Detroit, Michigan, had been delayed. They rescheduled the meeting for 4:00 p.m. at a Roy Rogers restaurant in Baltimore.
 
 
 4
 Umah met with the DEA agents shortly before the meeting with Okoh originally had been scheduled to occur. Umah informed the agents that earlier that afternoon he had a chance encounter with Okoh. Okoh invited Umah to visit the hotel room where Okoh's heroin supplier was staying. Okoh led Umah to room 102A of the Welcome Inn, where he introduced Umah to Benjamin Maduka. Maduka then showed Umah three "eggs" of heroin, each of which Umah estimated contained approximately fifty grams.
 
 
 5
 Umah's description of the "eggs" was consistent with the agents' experience with the packaging of heroin from Nigeria. The agents contacted the hotel and confirmed that Benjamin Maduka was the registered occupant of room 102A. The agents then placed the hotel room under surveillance. Room 102A is located in a building containing six rooms. The building has a single entrance and common stairs and hallways. The agents were able to monitor the door to the building, but could not watch the door to Maduka's room without being physically present in the hallway leading to the room. The room has two windows, which are four to five feet above the ground. The configuration of the neighboring buildings made it impossible for the agents to surveil the windows without being observed.
 
 
 6
 At approximately 4:00 that afternoon, the meeting between Okoh, Umah, and the agents took place as planned. Another person, identified only as "Johnny," accompanied Okoh to the meeting. Okoh informed the agents he had six or seven ounces of heroin for sale, and at Okoh's direction, Johnny handed an agent a sample of the heroin. The agents stated that if the sample was satisfactory they would be interested in making a large purchase. Okoh stated that the purchase must occur that evening because the source was going back to Detroit the next morning and wanted to sell all the heroin and collect all the proceeds before he left. He gave the agents the telephone number of the Welcome Inn as the number at which he could be reached and told them to ask for room 102A. During the course of the conversation, Okoh mentioned that some purchasers were coming from Washington, D.C. to buy the remainder of the source's heroin. Okoh and Johnny left the meeting together, and about one-half hour later, the agents watching the hotel saw Okoh enter the building in which room 102A is located.
 
 
 7
 The agents called Okoh at the hotel shortly before 7:00 p.m. to arrange another meeting for 7:30 that evening at the same restaurant where they had met earlier. The agents met with Okoh at the restaurant, while Johnny waited outside. They agreed to a purchase of thirty-five grams of heroin for $6,000.
 
 
 8
 The parties left the restaurant and drove to a nearby meeting place. Okoh and Johnny entered a townhouse and returned a short while later. Johnny was armed with a revolver, which he displayed openly in his waistband. Okoh gave the agents part of one of the "eggs," which he stated contained thirty-five grams of heroin, and the agents paid him $6,000 in cash. Okoh stated that he had given the remaining 15 grams of the "egg" to Johnny. He stated further that Johnny was to put the heroin out on the street and get the money for it so that they could get the money to their source. The agents told Okoh they might want to purchase more heroin later that evening, and Okoh stated he would be willing to make additional sales. Okoh gave the agents his home telephone number so that they could contact him if they raised more money.
 
 
 9
 The agents then left in their vehicle. Other agents following Okoh and Johnny observed Okoh drop Johnny off about a block from the scene of the transaction and continue on alone to the Welcome Inn. One of the agents at the hotel went into the building and observed Okoh enter room 102A. Okoh left the hotel approximately fifteen minutes later and drove away. Some of the agents followed Okoh and arrested him about a mile from the hotel at approximately 8:30 p.m. At the time of his arrest Okoh was carrying $1,800 of the $6,000 the agents had paid him for the heroin.
 
 
 10
 After making the arrest, the agents contacted an Assistant United States Attorney, who advised them to obtain a telephonic search warrant for room 102A and gave them the telephone numbers of the three local magistrates who possessed the necessary equipment to issue telephonic warrants. The agents attempted to contact the magistrates. At one number they reached an answering service and were informed that the magistrate was unavailable, calls to a second number produced no answer, and the third magistrate's line was busy. The agents continued calling the latter two magistrates every five or ten minutes. Slightly less than two hours later, the third magistrate's line was still busy and there still was no answer at the second magistrate's residence. The agents, with the advice of the Assistant United States Attorney, decided to arrest Maduka, secure the hotel room, and seek a search warrant the following morning.
 
 
 11
 At 10:30 p.m. the agents attempted to gain entry to Maduka's room by means of a ruse.[3] Maduka spoke with the agent, but did not open the door. The agents then identified themselves, told Maduka that he was under arrest, and demanded that he open the door. When Maduka did not open the door and the agents heard movements from inside the room, they forced the door open and entered the room.
 
 
 12
 The room was dark and Maduka was not in sight. The room's windows were closed. In addition to a single room, there was also a bathroom. One agent entered the bathroom and found no one there. Another approached the bed and noticed that a two foot by three foot panel in the room's drop ceiling had been moved, leaving a six to eight inch gap. The agent pushed against the dislodged panel, and two "eggs" of heroin and a number of hundred-dollar bills fell from the ceiling. At the time the agent touched the panel, the agents had been in the room for approximately thirty seconds without finding Maduka. At about the same time another agent noticed feet protruding from under the room's outside door. The agents discovered Maduka behind the door and placed him under arrest.[4]
 
 
 13
 Prior to trial, Maduka moved to suppress the heroin and currency the agents found in the hotel room. Maduka asserted that the evidence was inadmissible because it was the product of the agents' unconstitutional warrantless entry of his hotel room. The district court held the agents' actions were justified by exigent circumstances and denied the suppression motion.
 
 II.
 A.
 
 14
 Maduka first argues that the heroin and currency seized during his arrest should have been suppressed because he was arrested without a warrant and no exigent circumstances existed to justify a warrantless entry of his hotel room. He contends that the agents had little reason to suspect he would escape or destroy evidence before they were able to obtain a warrant. We disagree.
 
 
 15
 Warrantless entries into a person's home[5] are presumptively unreasonable. Mincey v. Arizona, 437 U.S. 385, 390 (1978). The presence of exigent circumstances, however, may justify an exception to the warrant requirement. Coolidge v. New Hampshire, 403 U.S. 443, 474-75 (1971); McDonald v. United States, 335 U.S. 451, 456 (1948); see Payton v. New York, 445 U.S. 573, 590 (1980). Courts often have recognized a reasonable belief on the part of police officers that evidence of a serious crime will be destroyed before they can obtain a warrant as one important factor in finding exigency sufficient to justify warrantless entry. Ker v. California, 374 U.S. 23, 40-41 (1963); United States v. Johnson, 802 F.2d 1459, 1462 (D.C.Cir.1986); United States v. Perdomo, 800 F.2d 916, 918, 920 (9th Cir.1986); United States v. Turner, 650 F.2d 526, 528 (4th Cir.1981); see Welsh v. Wisconsin, 466 U.S. 740, 749-53 (1984) (recognizing likely destruction of evidence as possible source of exigency, but holding circumstances cannot be exigent where underlying crime is minor); Schmerber v. California, 384 U.S. 757, 770-71 (1966) (reasonable belief delay would result in destruction of evidence supported finding of exigency).
 
 
 16
 Similarly, this Circuit has recognized a likelihood evidence will be destroyed as a factor to be considered in determining whether exigency justified warrantless entry in a particular situation. In Turner, we recognized a list of factors set out by the Third Circuit in United States v. Rubin, 474 F.2d 262 (3d Cir.), cert. denied, 414 U.S. 833 (1973), as some of the factors relevant for consideration in evaluating whether exigent circumstances sufficient to justify warrantless entry are present:
 
 
 17
 These include: (1) the degree or urgency involved and the amount of time necessary to obtain a warrant; (2) the officers' reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility of danger to police guarding the site; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband.
 
 
 18
 Turner, 650 F.2d at 528 (citing Rubin, 474 F.2d at 268-69). These factors were never intended to be either an exhaustive list or a set of requirements. See Rubin, 434 F.2d at 268 (prefacing the list with the words: "Circumstances which have seemed relevant to courts include...."); see also Turner, 650 F.2d at 528 ("some of the factors courts have considered relevant [include], ..."). As one court has noted, "the limitless array of factual settings that may arise caution against a checklist-type analysis." United States v. Acevedo, 627 F.2d 68, 70 (7th Cir.), cert. denied, 449 U.S. 1021 (1980). Rather, in evaluating whether exigent circumstances justified a warrantless entry, a court must scrutinize the particular circumstances of the case before it. Turner, 650 F.2d at 528; Rubin, 474 F.2d at 268.[6]
 
 
 19
 Here there is more than sufficient evidence to support the district court's finding of exigent circumstances. Strong evidence existed that Maduka was the source of Okoh's heroin[7] and that he had additional heroin in the hotel room at the time of his arrest.[8] In addition, Okoh went directly to the hotel after completing the sale to the agents, but had only $1,800 of the $6,000 the agents paid him on his person at the time of his arrest. Coupled with the other evidence that Maduka was the heroin supplier, this fact raised the clear inference that Maduka had the remaining $4,200 in his hotel room. Thus, there was a very high probability that the hotel room contained both evidence of a crime and a criminal.
 
 
 20
 The likelihood that suspects who discover government agents are close on their trail will destroy evidence in their possession is a commonly recognized source of exigency. United States v. Edwards, 602 F.2d 458, 468 (1st Cir.1979); see, e.g., Johnson, 802 F.2d at 1462; Perdomo, 800 F.2d at 919; United States v. Kulcsar, 586 F.2d 1283, 1287 (8th Cir.1983). In Turner we relied on the probability the inhabitant of the house was aware of his accomplice's arrest as an important factor justifying immediate warrantless entry of the house. 650 F.2d at 528. Although the arrest of the accomplice in Turner was carried out within sight of the house, there is no requirement that the occupant have been able to see the arrest. Where the circumstances give rise to a strong probability that the occupant will suspect his accomplice's arrest, that probability is an important factor in justifying a belief on the part of police that evidence is in danger of destruction. See Acevedo, 627 F.2d at 71 (accomplice's failure to return "might have tipped [defendant] that [accomplice] had been arrested"); Kulcsar, 586 F.2d at 1287 (accomplice's failure to return "could be expected to warn [defendant] something had gone wrong"). Here, the contraband was readily destructible, and it was likely to be destroyed if Maduka became aware that he was in imminent danger of arrest. Information known to the agents suggested a strong probability that Maduka expected Okoh to contact him, and the likelihood that Okoh's failure to do so would alert Maduka that the police had discovered his activities supported the need for rapid action.[9]
 
 
 21
 Another factor giving rise to exigency was that the configuration of the hotel made it impossible for the police to surveil its windows adequately. Moreover, the officers conducting the surveillance had only a very limited description of Maduka's appearance. As a result, there was some possibility that, alerted by Okoh's disappearance, Maduka might escape. See United States v. Johnson, 660 F.2d 749, 752-53 (9th Cir.1981) (officers' inability to secure all exits, combined with increasing likelihood suspects would discover they were under surveillance, justified warrantless entry), cert. denied, 455 U.S. 912 (1982).
 
 
 22
 An additional danger that the heroin would escape the agents arose from the expected arrival of the heroin buyers from Washington. Okoh had informed the agents that buyers were coming from Washington that evening to do business with Maduka, and the agents knew the buyers had yet to arrive at the hotel. The common entrance to the six-room building containing room 102A made it difficult for the agents to observe Maduka's visitors without being seen. In addition, the agents would not have been able to recognize the buyers on sight. Under the circumstances, a danger existed that the buyers could visit Maduka and escape with the heroin because the agents would be unable to ascertain their identity or to observe which of the six rooms they had visited. See Kulcsar, 586 F.2d at 1287 (impracticability of effective surveillance leading to possibility accomplice would arrive and remove evidence was source of exigency).
 
 
 23
 The uncertainty concerning when the agents would be able to obtain a warrant and the agents' good-faith efforts to do so also are important considerations. See Turner, 650 F.2d at 528. The agents tried diligently to contact a magistrate for almost two hours before making the decision to secure the room. At the time they finally decided to enter the room, the officers still could not be sure how long of a delay they faced before they would be able to obtain a warrant. With the passage of time, the chance that the buyers from Washington would arrive or that Maduka would be alerted by Okoh's disappearance and escape or destroy evidence became more and more likely. Thus, the agents were faced with an ongoing dilemma, which they only resolved in favor of a warrantless entry after good faith efforts to obtain a warrant failed.
 
 
 24
 It is not necessary for us to consider whether any of the factors listed is sufficient, standing alone, to justify a warrantless entry. The exigency of the circumstances must be judged in light of all relevant factors. The all but certain fact Maduka was in the room with heroin and money from the sale of heroin, the ever-increasing likelihood that Okoh's absence would alert Maduka to his plight, the imminent arrival of the buyers from Washington, the agents' inability properly to surveil the rooms' exits, and the continuing uncertainty as to when a warrant might be available all contributed to the exigency of the circumstances. Weighing all these considerations together, we find the exigency of the circumstances confronting the officers was sufficient to justify their warrantless entry of the hotel room.
 
 B.
 
 25
 Maduka argues, however, that even if the officers' entry was justified by exigent circumstances, their discovery of the heroin and currency was the product of a separate, unjustified warrantless search because it was not a legitimate part of his arrest. See Arizona v. Hicks, 107 S.Ct. 1149, 1152 (1987) ("[T]aking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of respondent's privacy unjustified by the exigent circumstances that validated the entry."). The officer who pressed on the ceiling panel acted within the time immediately following the forced entry of Maduka's hotel room. The officers knew Maduka had concealed himself somewhere within the limited confines of the hotel room, but had yet to find him. "The permissible scope of [their] search must, therefore, [have been] as broad as may reasonably [have been] necessary to prevent the dangers that the suspect at large in the [hotel room could] resist or escape." Warden v. Hayden, 387 U.S. 294, 299 (1967).
 
 
 26
 It was obvious that the ceiling panel had been moved, and the panel covered an opening large enough to allow a person to climb through it. Under the circumstances the police officer's action in pressing on the ceiling panel to ascertain whether Maduka was concealed above it was entirely reasonable. See United States v. Beck, 729 F.2d 1329, 1332 (11th Cir.), cert. denied 469 U.S. 981 (1984). Once the evidence fell into plain view, its seizure was proper. Hicks, 107 S.Ct. at 1153 (citing Coolidge v. New Hampshire, 403 U.S. 443, 465 (1971)). Accordingly, we affirm the district court's refusal to suppress the evidence.
 
 III.
 
 27
 Maduka's next argument is that the Government used its peremptory challenges to strike two members of his race from the jury in violation of his right to equal protection of law. During jury selection for Maduka's trial, the Government exercised six peremptory challenges. Four peremptory challenges were used to strike white potential jurors, while two peremptory challenges were used to strike black potential jurors. The resulting jury in Maduka's trial consisted of ten whites and two blacks. Madukah objects to the Government's use of peremptory challenges against the two blacks, citing Batson v. Kentucky, 476 U.S. 79 (1986). The district court found Maduka's contention had no merit and did not ask the Government to explain its use of peremptory challenges. The prosecuting attorney volunteered, however, that one significant reason for the peremptory challenges was the young age of the two blacks challenged. The challenged blacks were each twenty-one years old. Another black who went unchallenged was twenty-four, and a white who also was not challenged was twenty-three.
 
 
 28
 A black defendant alleging that the prosecutor has exercised his peremptory challenges with discriminatory intent so that members of the defendant's race have been impermissibly excluded from the jury may make out a prima facie case of purposeful discrimination by showing that the totality of the circumstances gives rise to an inference of discriminatory purpose. Batson, 476 U.S. at 96-97. While it is true that the racially motivated striking of one black juror violates equal protection even though other black jurors are seated, id. at 95; United States v. David, 803 F.2d 1567, 1571 (11th Cir.1986), the defendant still must show that the totality of the circumstances gives rise to an inference of discriminatory purpose in the striking of that juror. See Batson, 476 U.S. at 96-97; David, 803 F.2d at 1571. Whether a defendant has made a prima facie showing is a factual determination that we review under the clearly erroneous standard. United States v. Woods, 812 F.2d 1483, 1487 (4th Cir.1987); see Batson, 476 U.S. at 98 n. 21.
 
 
 29
 Maduka's sole argument to the district court in support of his claim to have established a prima facie case was that the Government had stricken two blacks from the venire without receiving any responses from them that indicated bias in favor of the defendant. Maduka's burden was to establish that the circumstances surrounding these strikes gave rise to an inference of intentional discrimination and his argument is insufficient to do so.
 
 
 30
 As the district court noted, the Government also struck white potential jurors who had made no responses suggesting they favored the defendant. Furthermore, the Government exercised only two peremptory challenges against blacks, while it exercised four peremptory challenges against whites. It permitted two blacks to remain on the twelve-member jury; a ratio closely approaching the proportion of blacks in the jury pool. "The fact that the government accepted a jury which included two blacks, when it could have used its remaining peremptory challenges to strike those potential jurors, shows that the government did not attempt to exclude all blacks, or as many blacks as it could, from the jury." United States v. Montgomery, 819 F.2d 847, 851 (8th Cir.1987).
 
 
 31
 Although the presence of the two black jurors does not, by itself, rule out the possibility Maduka could make a prima facie showing of racially-motivated use of peremptory challenges, he has presented nothing to support such a finding. The district court found the totality of the circumstances did not support a prima facie case, and we find no clear error in its decision.
 
 
 32
 For the reasons expressed above, the judgment of the district court is affirmed.
 
 
 33
 AFFIRMED.
 
 MURNAGHAN, Circuit Judge, dissenting:
 
 34
 The Supreme Court has held that "a search or seizure carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show ... the presence of 'exigent circumstances.' " Coolidge v. New Hampshire, 403 U.S. 443, 474-75 (1971). Because the defendant was arrested without a warrant and no exigent circumstances existed to justify a warrantless entry of his hotel room, I find that the defendant's Fourth Amendment right had been violated and that the heroin and currency seized during his arrest should have been suppressed. Accordingly, I respectfully dissent.
 
 I.
 
 35
 The courts have enumerated several factors to be considered in evaluating the existence of exigent circumstances. Circumstances which have seemed relevant to courts include: 1) a reasonable belief on the part of police officers exists that evidence will be destroyed or removed, Ker v. California, 374 U.S. 23, 40-41 (1963); United States v. Turner, 650 F.2d 526, 528 (4th Cir.1981); 2) the possibility is great of danger to police guarding the site, Turner, 650 F.2d at 528; 3) evidence of a serious or grave crime is involved, Dorman v. United States, 435 F.2d 385, 392 (D.C.Cir.1970) (en banc ); 4) information exists indicating that possessors of the contraband are aware that the police are on their trail, Turner, 650 F.2d at 528; 5) the contraband is readily destructible and ready destruction is threatened, id.; and 6) the degree of urgency involved is great and little time is available to obtain a warrant, id.
 
 
 36
 The majority concluded in the instant case that there was a strong probability that the defendant expected Okoh to contact him, and that Okoh's failure to do so would alert the defendant that the police had discovered his activities. The facts of the case do not support such a speculation. There is nothing in the record which indicates that Okoh was supposed to contact the defendant that night. While the undercover agents did discuss with Okoh the possibility of making additional purchases, the telephone number Okoh had given to the agents was not that of the defendant's motel room but that of Okoh's residence. Moreover, the additional purchase was never agreed upon and there is no indication that the defendant was even aware of such a discussion.
 
 
 37
 The cases relied upon by the government or cited in the majority opinion can be distinguished from the case at bar on the facts. In all those cases, there was a high probability bordering on certainty that the defendant either knew or would have become aware shortly of the fact that a co-conspirator had been arrested or that there was police surveillance. See United States v. Johnson, 802 F.2d 1459, 1462 (D.C.Cir.1986) (defendant suspiciously dropped a bag from his window to the roof below suggesting that he was aware of the police presence); United States v. Perdomo, 800 F.2d 916, 919 (9th Cir.1986) (arrest executed before the co-conspirator could return to the supplier with the transaction money); United States v. Wulferdinger, 782 F.2d 1473, 1476 (9th Cir.1986) (the seller told the detectives that he was expected to return to his supplier's residence within an hour); United States v. Cuaron, 700 F.2d 582, 586 (10th Cir.1983) (arrest executed before the co-conspirator could return to the supplier's house to obtain an additional pound of cocaine for the same purchaser); United States v. Turner, 650 F.2d 526, 528 (4th Cir.1981) (the officers reasonably believed that a co-conspirator could have seen the arrest of the defendant); United States v. Edwards, 602 F.2d 458, 468 (1st Cir.1979) (the officers reasonably believed that an undercover FBI agent may have been recognized by the defendant); United States v. Kulcsar, 586 F.2d 1283, 1287 (8th Cir.1978) (arrest executed before the seller could return to the supplier with the proceeds of the second sale); United States v. Gardner, 553 F.2d 946, 948 (5th Cir.1977), cert. denied, 434 U.S. 1011 (1978) (arrest occurred in front of the defendant's house); United States v. Rubin, 474 F.2d 262, 269 (3d Cir.1973), cert. denied sub nom., Agran v. United States, 414 U.S. 833 (1973) (the defendant yelled "Call my brother" when he was arrested suggesting that he was successfully trying to alert the persons remaining at the premises); Dorman v. United States, 435 F.2d 385, 388 (D.C.Cir.1970) (en banc ) (the officers had reason to believe that the defendant might flee when he became aware of the loss of his probation papers). In contrast, in the instant case, the facts on the record do not adequately support the agents' speculation that the defendant would have become aware shortly of his co-conspirator's arrest.
 
 
 38
 In addition, the facts do not indicate that the officers guarding the motel were in any danger. While the agents testified that "Johnny" who accompanied the seller carried a revolver, there is no indication either that "Johnny" was acquainted with the defendant or that the defendant himself was armed.
 
 
 39
 Moreover, while the drugs were readily destructible, there is no indication that ready destruction was threatened. The majority opinion relies on the fact that the supplier was expecting buyers from Washington, D.C. to arrive later that night. A further concern was raised that the configuration of the hotel made adequate surveillance difficult. While such circumstances might suggest that some degree of urgency is involved, other factors militate against a finding of exigency.
 
 
 40
 First, the agents knew that the supplier was not leaving town until next morning. Okoh's arrest had taken place at 8:30 p.m. Therefore, the agents had more than sufficient time to obtain a warrant.
 
 
 41
 Second, the agents failed to exercise reasonable efforts to obtain a telephonic warrant. See Carroll v. United States, 267 U.S. 132, 156 (1925) (the general rule is that "[i]n cases where the securing of a warrant is reasonably practicable, it must be used"). The government argues that the agents had tried for approximately two hours to obtain a warrant, but they gave up because the magistrate's telephone was busy.[1] During the oral argument, the government acknowledged that Magistrate Goetz's wife had been on the telephone that evening with one of her children. The agents made no effort to break into the line. Admittedly, in some instances, the inability to reach a magistrate may be a factor to be considered in evaluating the existence of exigent circumstances. However, I am averse to finding exigency every time a magistrate's telephone is busy because of a personal phone call.
 
 
 42
 The facts of the case, therefore, do not support a finding of exigency. The warrantless search of the defendant's motel room violated his Fourth Amendment right to be free from unreasonable search and seizure.
 
 II.
 
 43
 Even if the agents' entry was justified by exigent circumstances, the evidence found during the search should have been suppressed because it was a product of an overly broad search incident to arrest. A warrantless search must be strictly circumscribed by the exigencies which justified its initiation. See Arizona v. Hicks, 107 S.Ct. 1149, 1152-53 (1987); Mincey v. Arizona, 437 U.S. 385, 393 (1978).
 
 
 44
 The majority held that it was reasonable for the agents to tap the dislodged ceiling panel because the defendant might have concealed himself behind it. I find it incredible that during the short time between the first knock on the door and the agents' entrance into the bedroom, a person could have climbed into the false ceiling, even if it had been strong enough to hold the weight. I, therefore, question whether the agents reasonably could have thought that the defendant was hiding behind the ceiling panel. Because I find the search to have been overbroad, I reject the majority's holding that the contraband was placed in plain view when it could be seen only when the agents caused it to fall out of the ceiling.
 
 
 45
 In sum, believing that the conviction should be vacated and the case remanded for a new trial, I respectfully dissent.
 
 
 
 [1]
 Maduka was convicted of conspiracy to distribute heroin and to possess heroin with the intent to distribute it, 21 U.S.C. Sec. 846 (1982); distribution of heroin and aiding and abetting the distribution of heroin, id. Secs. 841(a)(1), 18 U.S.C. Sec. 2 (1982); possession with intent to distribute over 100 grams of heroin, 21 U.S.C.A. Secs. 841(a)(1), (b)(1)(B)(i) (West 1981 & Supp.1987); and interstate travel in aid of racketeering and aiding and abetting interstate travel in aid of racketeering, 18 U.S.C. Secs. 1952(a)(3), 2 (1982)
 
 
 [2]
 Umah had testified for the Government in two prior cases in which the defendants were convicted of heroin related offenses
 
 
 [3]
 An agent knocked on the door, told Maduka that Okoh had been in an automobile accident up the street, and asked if Maduka would come get Okoh's car. Maduka's response was uncommunicative
 
 
 [4]
 The agents then secured the room until morning, when they obtained a search warrant and returned to search the room. The search produced only documentary evidence
 
 
 [5]
 A guest in a hotel room shares in the fourth amendment protection against warrantless invasion. Hoffa v. United States, 385 U.S. 293, 301 (1966); Stoner v. California, 376 U.S. 483, 490 (1964)
 
 
 [6]
 Another oft-cited list of relevant factors is that set out by the District of Columbia Circuit in Dorman v. United States, 435 F.2d 385, 392-93 (D.C.Cir.1970) (en banc). These factors include:
 1) Whether a "grave offense" is involved.
 2) Whether "the suspect is reasonably believed to be armed."
 3) Whether there is a "clear showing of probable cause."
 4) Whether there is "strong reason to believe the suspect is in the premises being entered."
 5) Whether it is likely the suspect will escape if not apprehended rapidly.
 6) Whether the entry is made peaceably.
 Id. at 392-93. Like the Rubin court, the Dorman court did not intend that its list be exclusive or that all the factors be considered requirements. Id. at 392 (prefacing the list with the words: "it may be useful to refer to a number of considerations that are material, and have particular pertinence in the case at bar"); see also Acevedo, 627 F.2d at 70; United States v. Adams, 621 F.2d 41, 44 (1st Cir.1980).
 
 
 [7]
 Umah, an informant proven to be extremely reliable, told the agents that Okoh had been awaiting the arrival of his source from Detroit, that Okoh introduced Maduka to Umah as his source, and that Maduka possessed three "eggs" of heroin in the hotel room earlier that day. The taped conversation between Umah and Okoh as well as Okoh's later conversations with the agents confirmed parts of Umah's story. The hotel room in which Umah said Maduka was staying was registered to Maduka. In addition, Okoh gave the agents the telephone number of Maduka's room as a number at which he could be contacted to arrange the purchase, and the agents did contact him at that number. Finally, Okoh returned to Maduka's hotel room immediately after the purchase
 
 
 [8]
 Okoh told the agents that more heroin was available for purchase that night. He also stated that his source was expecting buyers from Washington, D.C. to arrive later that night. Moreover, the heroin Okoh had with him at the restaurant was only one third of the amount Umah reported seeing at the hotel
 
 
 [9]
 The agents had discussed with Okoh the possibility of making an additional purchase that night. They had heard Okoh say that Johnny was to get the money for his part of the heroin right away because the source was leaving town the next morning and wanted to sell all the heroin and collect all the proceeds before he left. Under these circumstances, there was a strong probability that Madukah expected Okoh to contact him again before he left and that Okoh's disappearance would cause Maduka to suspect Okoh's arrest
 
 
 [1]
 Initially, the agents tried to contact three magistrates. They received no answer at the homes of Magistrates Kenkel and Rosenberg, while Magistrate Goetz's phone was busy