12 F.3d 1101
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff/Appellee,
v.
William CRAIG III, Defendant/Appellant.
 No. 93-1761.
 United States Court of Appeals, Seventh Circuit.
 Argued Oct. 6, 1993.
Decided Dec. 2, 1993.
As Amended Dec. 3, 1993.
 
 Before MANION and ROVNER, Circuit Judges, and PELL, Senior Circuit Judge.
 
 ORDER
 
 1
 William Craig III appeals the denial of his motion to suppress evidence that police officers obtained after arresting him in the garage of his home in Merrillville, Indiana. Because the district court correctly determined that the arresting officers had probable cause to arrest Craig and that exigent circumstances justified their warrantless entry into his garage to make the arrest, we affirm.
 
 I. BACKGROUND
 
 2
 The facts are undisputed. Sheila Morrow was employed at the South Suburban Postal Facility located in Bedford Park, Illinois. On March 5, 1992, at approximately 12:20 p.m., Morrow was shot as she left her office at the Postal Facility. The course of the bullet through Morrow's body suggested that she had been shot from the catwalk above the Postal Facility's workroom, across the hall from the entrance to her office.
 
 
 3
 That morning, Morrow had met with Craig at the Postal Facility, where Craig was employed as a letter-sorting machine operator. During this meeting Morrow had accused Craig of falsifying his time card in order to draw overtime pay to which he was not entitled. Craig denied any wrongdoing, contending that he had been working for other supervisors during the time in question. Morrow escorted Craig to meetings with several other supervisors, all of whom reported that they had not requested that Craig work any overtime hours. Craig was seen leaving the Facility at 9:20 a.m. and was not scheduled to return until 10:30 that evening (Craig's regular hours of work were 10:30 p.m. to 7:00 a.m.). Thereafter Morrow met with Richard Melton, the controller of the Facility, to tell him about Craig's phantom overtime hours and about her confrontation with Craig that morning.
 
 
 4
 A nurse on duty at the Facility attended to Morrow immediately after the shooting. Morrow related to the nurse that she had not seen who had shot her but told the nurse to "tell Mr. Melton, the man we spoke about this morning, get him." Morrow also stated that she had seen the man she "got into it with" that morning at the Facility. Paramedics then rushed Morrow to the hospital. The nurse relayed Morrow's statements to Melton, who reported to Postal Inspectors that Morrow had been shot, that Morrow had a confrontation with Craig three hours before she was shot, that Craig, although not scheduled to work, had been seen at the Postal Facility that morning, and that he believed Craig had shot Morrow.
 
 
 5
 Postal Inspector Eduardo Santa Cruz recognized Craig's name from a handwritten letter that he had received from Craig nine days earlier. The letter stated that "auto burglaries have become rampant on the postal parking lot [at the Postal Facility]." Craig noted in this letter that his car had been burglarized in December of 1991 and that other postal employees had been victimized as well. The letter concluded: "This violation causes undue stress and anxiety on ones [sic] workmanship. I feel if something is not done about this, violence will be eventual. This we must avoid. Will you please look into this?"
 
 
 6
 At approximately 1:00 p.m. postal inspectors in Chicago contacted Postal Inspector Richard Ligon in Indiana about the shooting. They told him that Craig, who lived in Merrillville, had a confrontation with the victim that morning and that Craig was a suspect in the shooting. They also read Ligon Craig's letter about the burglary of his automobile and informed him that Craig had been seen at the Postal Facility that morning. Ligon gave Craig's address to a dispatcher at the Merrillville Police Department and told him that Craig might be headed home. Craig's home was about an hour's drive from the Postal Facility. Ligon arrived at Craig's residence at about 1:18 p.m., where he was met by Sergeant Paul DeHaven of the Merrillville Police Department. DeHaven informed Ligon that Craig's home was under surveillance by police officers in several unmarked police cars.
 
 
 7
 At approximately 1:23 p.m. (approximately one hour after the shooting), Craig drove down the street and into his driveway. He was unaware that police officers were watching his every move. Craig opened the door to his garage (which was attached to his residence) with an electric garage door opener. As Craig drove into his garage, Postal Inspector Ligon, Sergeant DeHaven, and Detective Kenneth O'Deen sprinted toward Craig's garage with their guns drawn. By this time the garage door had begun to close. DeHaven grabbed the door and pulled it open, ripping the door off its metal track. As they entered the garage DeHaven and O'Deen announced that they were police officers, but Craig did not hear the announcement and did not become aware of the presence of the police until after they were in his garage. DeHaven again announced that he was a police officer and directed Craig to exit his truck. Craig complied and walked to the rear of his truck where, at DeHaven's direction, he lay on his stomach. As he lay on his driveway being handcuffed, Craig inquired, "What's this all about?" DeHaven responded, "You know what it's about." Craig replied, "Yes, I do," or "Yes, I know." DeHaven then told him, in substance, "You're okay she's alive; we're here to get the gun." Craig told him that the gun was in his truck. DeHaven walked to the front passenger side of Craig's truck, looked inside, and saw a handgun in plain view. DeHaven seized the handgun, a loaded .38 caliber revolver.
 
 
 8
 Following his arrest, Craig was taken to the Merrillville police station. There he denied having any "arguments or altercations" with anyone that morning. He admitted that he had returned to the Postal Facility around noon that day to pick up a job application for his brother but denied shooting anyone. He claimed that he was minding his own business when an unknown man pulled a gun on him, forced him onto the catwalk overlooking the workroom, and made him watch while he fired one round through the window or floor of the catwalk. According to Craig, the man then pressed the gun into Craig's hand, pulled out another gun, and told Craig to leave. Craig stated that he drove home but never contacted any law enforcement authorities about the incident.
 
 
 9
 Craig was charged by indictment with assaulting an employee of the United States Postal Service with a deadly weapon in violation of 18 U.S.C. Sec. 111, using a firearm in connection with a crime of violence in violation of 18 U.S.C. Sec. 924(c), and attempting to murder an employee of the United States Postal Service in violation of 18 U.S.C. Sec. 1114. Craig moved to suppress the revolver that was found in his truck and the statements that he made at the police station on the ground that the evidence was obtained as the result of an unlawful, warrantless arrest. A magistrate judge recommended that Craig's motion be denied, concluding that: (1) the officers had probable cause to arrest Craig; (2) exigent circumstances justified the officers' warrantless entry into Craig's garage to make the arrest; and (3) even if exigent circumstances did not justify the officers' entry into Craig's garage, the revolver should not be suppressed because it inevitably would have been discovered by lawful means. The district court adopted the magistrate judge's recommendation.
 
 II. DISCUSSION
 
 10
 We first address the issue whether the law enforcement officers had probable cause to arrest Craig. We review the district court's finding that they did for clear error. See United States v. Spears, 965 F.2d 262, 268-71 (7th Cir.), cert. denied, 113 S.Ct. 502 (1992). The second issue is, even if the officers had probable cause to arrest Craig, whether they justifiably entered Craig's garage to make the warrantless arrest. We also review for clear error the district court's finding that exigent circumstances justified the officers' entry. See United States v. Sewell, 942 F.2d 1209, 1213 (7th Cir.1991), cert. denied, 112 S.Ct. 1567 (1992). Finally, the third issue is whether the pistol found in Craig's truck was admissible evidence under the doctrine of inevitable discovery. We review for clear error the district court's finding of admissibility. See United States v. Kelly, 991 F.2d 1308, 1311 (7th Cir.1993); Spears, 965 F.2d at 271 n. 3. Under the "clearly erroneous" standard of review, we will not disturb a district court's findings unless we are left with the definite and firm conviction that a mistake has been made. Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985).
 
 A. Probable Cause To Arrest
 
 11
 The police officers arrested Craig without a warrant. A warrantless arrest is valid under the Fourth Amendment only if supported by probable cause. Beck v. Ohio, 379 U.S. 89, 90 (1964). Craig submits that the officers lacked probable cause to arrest him. The standard for determining whether probable cause exists is "a practical, common sense determination about whether, given all the circumstances present, it is reasonably probable that a person has committed ... an offense." United States v. Valencia, 913 F.2d 378, 382 (7th Cir.1990). "Probable cause for an arrest exists if, at the moment the arrest was made, the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that an offense has been committed." Hughes v. Meyer, 880 F.2d 967, 969 (7th Cir.1989), cert. denied, 495 U.S. 931 (1990).
 
 
 12
 Craig asserts that when they arrested him the officers did not have sufficient information to warrant a prudent person in believing that he had shot Morrow. According to Craig, when the officers arrested him all they knew was that Morrow had been shot at the Postal Facility, that she did not see who shot her and there were no eyewitnesses to the shooting, that Morrow had a dispute about overtime hours with him several hours earlier, and that he had written a cryptic letter complaining about the lack of security in the employee's parking lot a few months earlier. Although a police officer need not have absolute proof that the person he is arresting committed the crime, probable cause for an arrest requires more than bare suspicion. United States v. Burrell, 963 F.2d 976, 986 (7th Cir.), cert. denied, 113 S.Ct. 357 (1992). Craig argues that the aggregate of the facts within the officers' knowledge at the time of the arrest only supports a bare suspicion that he, and not someone else, shot Morrow and, as such, although the officers might have been justified in seeking him out to question him about the shooting, they were not justified in arresting him.[1]
 
 
 13
 In support of this argument, Craig cites United States v. Ingrao, 897 F.2d 860 (7th Cir.1990). There the district court found probable cause for the defendant's arrest where law enforcement officers saw the defendant walk out of a gangway at the home of a reputed drug-trafficker while carrying a black bag, shortly after another man had made an exchange of packages in front of the gangway. The officers arrested the defendant immediately as he drove away with the bag. Id. at 862-63. This court reversed, holding that these facts alone did not give the officers probable cause to arrest the defendant. Id. at 865-66. As this court subsequently noted in United States v. Burrell, 963 F.2d at 986-87, the district court's finding of probable cause in Ingrao was clearly erroneous because it was supported only by the defendant's association with a reputed drug trafficker. Craig asserts that the only support for the finding of probable cause in this case was his association with Morrow, which consisted of a work-related disagreement with her on the day she was shot.
 
 
 14
 We agree with the magistrate judge that the evidence pointing to Craig as the shooter is not as limited as Craig would have us believe. First, there is the shooting itself. The officers knew that the shooting took place within a secured mail processing facility, to which only postal service employees had access. A keycard that only employees possessed was necessary to gain entry to the area where the shooting took place. Granted (as Craig points out) at the time Morrow was shot the Postal Facility was undergoing construction so the usual policy of limiting access to the workfloor was not in full effect. Craig contends that, given the relaxed security at the Postal Facility, Morrow's assailant could have been a construction worker or anyone else who wandered in off the street. Nonetheless, the circumstances suggest that the shooting of Morrow was not a random act of violence, but was accomplished by someone who knew the layout of the Postal Facility: Morrow was hit by a single bullet as she walked out of her office, and the shot was taken from a strategic location above and behind her. Although security at the Facility might have been relaxed, it did exist. Moreover, the law enforcement officers reasonably concluded that the shooter likely knew Morrow. Morrow was shot as she left her office, suggesting that the shooter knew Morrow's location. That the shooter was a postal service worker who knew Morrow was a fair inference based on these facts.
 
 
 15
 Second, Craig had a motive. Given that the law enforcement officers reasonably believed the shooter was a postal service worker who knew Morrow and that the shooter intended to shoot Morrow, the officers could reasonably conclude that whoever shot Morrow believed that he had a reason for doing so. The officers knew that Craig had a motive to shoot Morrow because they were aware that three hours before the shooting, Craig had a confrontation with Morrow, during which Morrow had accused him of fraud and had taken the first steps toward having him removed from his job. Although the officers might not have known the details of the confrontation--who confronted who, whether either party showed anger or threatened violence, or how the matter ultimately was resolved--the critical fact that Craig had argued with Morrow shortly before Morrow was shot had been conveyed to them. The officers also knew that moments after the shooting, Morrow had spontaneously named the defendant as the likely shooter. This is significant because, from the officers' perspective, Morrow was in the best position to know who had a motive to shoot her.
 
 
 16
 Third, there is corroborating evidence. The law enforcement officers were told that Craig was seen at the Postal Facility on the morning of the shooting (after he had met with Morrow) although he was not scheduled to work. They were aware that Craig lived one-hour's drive from the Postal Facility, and they saw him drive up to his home approximately one hour after the shooting. Given the information implicating Craig that they already had, the officers were not obliged to disregard Craig's timely arrival at his home as a mere coincidence.[2]
 
 
 17
 Granted, this information would not permit the conclusion that Craig was guilty of shooting Morrow. But the determination whether probable cause to arrest exists deals with probabilities, not hard certainties. United States v. Cortez, 449 U.S. 411, 418 (1981). These probabilities are the product of police officers' "common-sense conclusions about human behavior." Id.; see also Texas v. Brown, 460 U.S. 730, 742 (1983) ("probable cause is a flexible, common-sense standard"). We believe that the facts and circumstances known by the officers when they arrested Craig support a common-sense conclusion that Craig probably had shot Morrow because she had accused him of fraudulently requesting compensation for overtime hours. We therefore agree with the district court's finding that the officers had probable cause to arrest Craig.
 
 B. Exigent Circumstances
 
 18
 Even if the law enforcement officers had probable cause to arrest Craig, the government must justify the officers' warrantless entry into Craig's garage to effectuate the arrest.[3] The Fourth Amendment prohibits law enforcement officers from making a "warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." Payton v. New York, 445 U.S. 573, 576 (1980). A warrantless entry into a suspect's home to make an arrest is lawful, however, if the entry is justified by exigent circumstances. Id. at 583. The government bears the burden of proving that its agents had an objectively reasonable belief that exigent circumstances existed at the time of their warrantless entry into Craig's garage. United States v. Dowell, 724 F.2d 599, 602 (7th Cir.), cert. denied, 466 U.S. 906 (1984).
 
 
 19
 The sine qua non of the "exigent circumstances" exception to the requirement that law enforcement officers obtain a warrant to enter a suspect's home is the combination of "a compelling need for official action and no time to secure a warrant." Michigan v. Tyler, 436 U.S. 499, 509 (1978). Factors that indicate exigent circumstances include: (1) the suspect is accused of committing a grave or violent offense; (2) a reasonable belief that the suspect is armed; (3) probable cause to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; and (5) a likelihood that delay could cause the escape of the suspect or the destruction of essential evidence, or jeopardize the safety of officers or the public. See United States v. Wicks, 995 F.2d 964, 970-71 (11th Cir.1993); United States v. Standridge, 810 F.2d 1034, 1037 (11th Cir.), cert. denied, 481 U.S. 1072 (1987); United States v. Williams, 612 F.2d 735, 739 (3d Cir.1979), cert. denied, 445 U.S. 934 (1980); Dorman v. United States, 435 F.2d 385, 392-93 (D.C.Cir.1970) (en banc).[4]
 
 
 20
 That the third and fourth factors were present in this case cannot be disputed: We already have concluded that the officers had probable cause to believe that Craig shot Morrow. And because the officers saw Craig drive his truck into his garage immediately before they entered it to make the arrest, their belief that Craig was in the garage obviously was reasonable. The remaining factors are present in this case as well. The arresting officers were aware that Craig would be charged with, at minimum, assaulting an employee of the United States Postal Service with a deadly weapon, a very serious and violent crime. They reasonably believed that Craig was still armed when he pulled into his garage because they knew that the assailant had fired only one shot at Morrow and because, given Craig's timely arrival in Merrillville, it was unlikely that Craig had stopped on the way home from the Postal Facility to dispose of the pistol. Finally, it was likely that any delay in making the arrest would jeopardize the safety of the officers. Had the officers allowed the garage to close, Craig might have been able to shoot at them from inside the garage or the house. The officers could only speculate whether Craig had an arsenal of weapons inside his house that he could use against them once he was inside. It was safer to arrest Craig immediately than to wait for a warrant and risk a gun battle erupting in Craig's neighborhood should Craig try to escape. See Standridge, 810 F.2d at 1037 (risks that suspect might discover that police were watching him and that engage law enforcement officers in gun battle from inside motel room created exigent circumstances justifying warrantless entry into motel room).
 
 
 21
 Craig argues that the officers could not have reasonably believed that he would flee or engage in a shoot-out with them because he was not even aware that the officers were watching him. In support of this argument, Craig cites United States v. Lynch, 934 F.2d 1226 (11th Cir.1991), cert. denied, 112 S.Ct. 885 (1992), where the court stated:
 
 
 22
 Suspects who are inside their homes and unaware of their impending arrests generally have no reason immediately to flee, nor would they ordinarily have any reason immediately to destroy the fruits of their crime. Likewise, without more there is little reason for them to endanger the lives of themselves or others. Consequently, law enforcement officers confronting this type of situation can, without great difficulty, maintain surveillance of the premises and either wait to effectuate a valid public arrest when the suspects emerge or seek an arrest warrant from a neutral and detached magistrate.
 
 
 23
 Id. at 1232 (quoting United States v. George, 883 F.2d 1407, 1413-14 (9th Cir.1989)).
 
 
 24
 Nevertheless, the arresting officers in this case could have reasonably believed that Craig had a reason to flee immediately, or to take actions that would jeopardize their safety. The officers did not know that Craig was unaware that they were watching him until after the arrest. They could only speculate whether Craig had noticed that he was being watched and planned to escape or shoot at them once the garage door closed. Although, in retrospect, Craig's chances of successfully escaping were slim, the risk was real to the officers on the scene. They were justified in acting quickly to avoid any risk of Craig escaping.
 
 
 25
 Moreover, unique facts in this case created exigencies that were not present in either Lynch or George. First, unlike the law enforcement officers in those cases, the officers here had little time to set up surveillance. In Lynch and George, the law enforcement officers had the luxury of being able to set up surveillance outside the suspects' homes while the suspects were inside and unaware of the officers' activities. The suspects in those cases could have been arrested, by surprise, had they attempted to exit their homes. The officers were in the position to obtain and execute an arrest warrant before the suspects had the opportunity to resist. By contrast, the officers in this case reached Craig's home shortly before Craig did. En route home, Craig drove by unmarked police cars that were parked along the street and in the driveway of the home of one of Craig's neighbors. This gave Craig an opportunity to discover that he was being watched, even before he entered his home.
 
 
 26
 Second, unlike Lynch and George, this case involved the efforts of law enforcement authorities in two cities that are located miles apart. The officers who arrested Craig were not the same officers who gathered evidence at the scene of the shooting. The officers at the scene of the shooting had to relay information, as they discovered it, to the Merrillville Police Department. The police department had to pass along the information to the officers outside Craig's home. The information received by the officers outside Craig's home was that Craig was suspected of shooting his supervisor, that he might be armed and dangerous, and that he was on his way home. Justifiably, their primary concern was to minimize the risk to themselves and anyone else in the area by ensuring that Craig would not gain a tactical advantage by absconding in his home.
 
 
 27
 The likelihood that Craig would destroy evidence before law enforcement officers could secure a warrant and find the evidence also created exigent circumstances. See United States v. De Soto, 885 F.2d 354, 368 (7th Cir.1989). The officers could have reasonably believed that Craig would want to prevent investigating officers from discovering the pistol, glass or dust from the Postal Facility, or gun powder residue on his skin or clothing. After all, Craig probably was aware that he was a suspect in the shooting and that law enforcement officers investigating the crime would soon be on his trail, if they weren't already. The law enforcement officers were justified in apprehending Craig before he could destroy valuable evidence.
 
 
 28
 In sum, the circumstances in this case resulted in a compelling need for action and no time to secure a warrant. Because Morrow had been shot only an hour before the officers encountered Craig, it was reasonable for the officers to believe that Craig was armed and dangerous. It also was reasonable for them to assume that Craig would flee or destroy evidence before they could secure a warrant. We therefore agree with the district court's finding that the officers' warrantless entry into Craig's garage did not run afoul of the Fourth Amendment.
 
 C. Inevitable Discovery
 
 29
 Even if the officers' warrantless entry into Craig's garage violated the Fourth Amendment, the district court properly admitted the pistol into evidence. Under the "inevitable discovery" exception to the exclusionary rule, evidence that was obtained in violation of the Fourth Amendment should not be suppressed "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." Nix v. Williams, 467 U.S. 431, 444 (1984). The government satisfied its burden in this case. As noted above, the officers had probable cause to arrest Craig. Thus, the officers certainly had probable cause to search the vehicle that Craig drove into his garage. It seems inevitable that a lawful search of Craig's truck would have turned up the pistol given that the officers discovered it in plain view on the center console between the front seats. Even if Craig had removed the pistol to his house, it appears inevitable that officers would have discovered it. Because they had probable cause to arrest Craig, the officers could have obtained a warrant to search for the pistol and other evidence in Craig's home, where he went directly after the shooting.
 
 
 30
 Finally, as the government notes, even if the officers' entry into Craig's garage were unlawful, Craig's statements at the Merrillville police station would be admissible: In New York v. Harris, 495 U.S. 14, 17 (1990), the Supreme Court held that statements made by an arrestee outside his home are not subject to the exclusionary rule, even if made following a warrantless, unlawful entry into the arrestee's home.
 
 III. CONCLUSION
 
 31
 For the foregoing reasons, we AFFIRM the district court's denial of Craig's motion to suppress the pistol and the statements that he made at the Merrillville police station.
 
 
 
 [1]
 Although both parties refer to what "the officers" knew (referring to what the police officers who arrested Craig knew when they arrested him), the relevant issue is what the postal inspectors in Chicago and Merrillville knew when they requested that the Merrillville police arrest Craig. The postal inspectors, not the Merrillville police, gathered all the facts that formed the basis of Craig's arrest. Without the information given to them by the postal inspectors, the Merrillville police lacked probable cause to arrest Craig. Thus only if the postal inspectors had probable cause to arrest Craig was Craig's arrest by the Merrillville police lawful. See United States v. Hensley, 469 U.S. 221, 232-33 (1985); see also Valencia, 913 F.2d at 383 (state officers' arrest of suspect based on DEA agent's probable cause suffices for Fourth Amendment inquiry)
 
 
 [2]
 The government also points to Craig's letter complaining about burglary of his automobile in the Postal Facility's parking lot as evidence that supports a finding of probable cause for the officers to arrest Craig. The government submits that the letter (particularly the statement that "I feel if something is not done about [the burglary], violence will be eventual") gave the officers reason to believe that Craig was mentally or emotionally unstable enough to have shot Morrow. The magistrate judge did not rely on the letter to reach her conclusion that the officers had probable cause to arrest Craig. Neither do we. As the magistrate judge noted in her report and recommendation to Judge Aspen, the letter "can innocently be interpreted as nothing more than a complaint regarding car thefts and employee security." Only in hindsight is the letter relevant to the shooting of Morrow
 
 
 [3]
 The government concedes that the garage, which was attached to Craig's home, is a part of curtilage to Craig's home--that is, the area outside the home itself but so close to and intimately connected with the home and activities that go on there that it can reasonably be considered part of the home. See United States v. Dunn, 480 U.S. 294, 300 (1987). At the same time, however, the government argues that the officers did not need a warrant to arrest Craig in his garage because Craig had a lesser expectation of privacy while in his garage than he would have had in his home, particularly because he was in his truck and the garage door was open. In support of this argument the government cites United States v. Santana, 427 U.S. 38, 42 (1976), where the Supreme Court held that a defendant had no expectation of privacy while she stood in the doorway of her house holding a paper bag that contained drugs, and United States v. Sewell, 942 F.2d 1209, 1212 (7th Cir.1991), where this court held that a defendant had no expectation of privacy while he was engaging in illegal drug deals just inside the open door to his apartment. These cases do not support the government's position, however. Unlike the defendant in Sewell, Craig was not overtly committing a crime in a public place when he was arrested. And Santana is readily distinguishable because it was a "hot pursuit" case: The officers announced themselves while they were still outside the defendant's house but were forced to chase the defendant into her house to apprehend her. In this case, Craig did not attempt to flee, and the police did not announce themselves until they were inside Craig's garage. Thus this case is governed by Payton v. New York, 455 U.S. 573 (1980), which holds that the Fourth Amendment prohibits law enforcement officers from making a nonconsensual, warrantless entry into a suspect's home in order to make a routine felony arrest, rather than by Santana or Sewell. Craig had an expectation of privacy while in his garage, and the government must establish that exigent circumstances justified the officers' warrantless entry
 
 
 [4]
 In considering these five factors, we take heed of this court's observation in United States v. Acevedo, 627 F.2d 68, 70 (7th Cir.1980), that because of the limitless array of factual settings that might give rise to a warrantless entry into a suspect's home, a "checklist-type analysis" should not be applied in determining whether exigent circumstances justified the entry. As the Acevedo court advised, we use the factors only as "a guide to resolution of the underlying pragmatic question whether the exceedingly strong privacy interest in [Craig's] residence is outweighed by the risk that delay will engender injury, destruction of evidence, or escape." Id