In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-2785 and 99-2880

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

KELLY JO MAY and LEE TERRY,

Defendants-Appellants.

Appeals from the United States District Court
for the Central District of Illinois.
No. 98 CR 20061--Michael P. McCuskey, Judge.

Argued January 12, 2000--Decided June 6, 2000

   Before POSNER, Chief Judge, COFFEY and RIPPLE,
Circuit Judges.

   COFFEY, Circuit Judge.  On October 8, 1998, a four-
count indictment was filed in the Central District
of Illinois charging Kelly Jo May and Lee Terry
with events arising out of the armed bank robbery
of the Champaign County Schools Employees Credit
Union in Champaign, Illinois./1 After the
juries/2 returned guilty verdicts against both
defendants, the judge sentenced May to 147 months'
imprisonment, five years' supervised release, a
$300 special assessment, and restitution in the
amount of $11,038.75./3 The judge then sentenced
Terry to life imprisonment, a $300 special
assessment, and restitution also in the amount of
$11,038.75./4 On appeal, both defendants-
appellants argue that the trial judge erred in
denying their motion to suppress the evidence
seized from their residence. May also argues that
the court erred in allowing the jury to continue
its deliberations, at least without conducting a
hearing, after the district court judge received a
note from the jury foreperson suggesting that a
juror may have been a crime victim. We affirm.

I.  BACKGROUND

   On September 14, 1998, at approximately 2:00
p.m., when only three employees were present in
the bank,/5 Terry and May entered the Credit
Union in Champaign, Illinois. The two armed

defendants approached bank employees, Ciara Bradley and Tasha Jenkins, and May ordered Bradley to "put the money in the bag." Terry then walked down the hallway to Heather Winkleman's office, brought her to the front, and told Bradley and Jenkins to open all the teller drawers. Winkleman then asked Terry if he also wanted the money from the vault and he responded that he did. The two went back into Winkleman's office and retrieved the vault keys; Winkleman opened the vault and handed the money to the two perpetrators./6 Terry and May left the bank with $11,038.75.

After leaving the bank, Terry and May went to a nearby Illinois power station and removed the clothing worn during the robbery, poured gasoline on the clothes, and ignited them. Thereafter, the two then went to the General Auto Market in Urbana, Illinois, and Terry made a $4,000 cash down-payment on a 1995 GMC van.

On September 15, 1998, the Champaign, Illinois, Police Department (CPD) received an anonymous tip that it was Terry who had robbed the bank and that a female accompanied him during the bank robbery. On September 16, 1998, CPD received another anonymous tip stating that May and her boyfriend "Teddy" had robbed the bank, and that they had just bought a van.

The next day, September 16, 1998, a detective went to Terry's and May's residence and saw a 1995 GMC van. Upon inspection of a sticker on the van, the officer discovered that it had just been purchased from the General Auto Market in Urbana, Illinois. The detective proceeded to the dealership and learned that Terry and May had purchased the van on September 14th, just a few hours after the robbery, with a $4000 cash down-payment.

The dealership informed the detective that Terry's and May's $4000 down-payment was deposited in the night deposit-box at First of America Bank located at the Meijer Store in Champaign, Illinois. Police officers were later able to retrieve and examine the deposit and found fourteen $20 bills with serial numbers that matched the recorded bait money taken during the robbery./7

On September 16, 1998, based on the information described above, a federal arrest warrant for Terry was issued. At this time, federal investigators learned that the Illinois State Police had obtained a search warrant for Terry's and May's residence in Champaign on an unrelated drug matter. While serving both the state search warrant and federal arrest warrant,/8 officers

recovered $1,186 cash (three $20 bills were bait money) and five grams of marijuana, and Terry was taken into custody.

Kenneth Faust, who also resided with Terry and May, was interviewed by police officers and informed them that a few days before the search, he had seen a gun in a small blue diaper bag in one of the bedrooms of the residence, and that Terry was "touchy" about people going near a shed located behind the residence. He further stated that Terry and May had recently complained about being broke and that they now were spending a lot of money.

Based on Faust's statements, officers obtained a federal search warrant for the shed./9 Once inside the shed, officers located a blue diaper bag which contained two loaded weapons, a .32 caliber H&R revolver and a .357 Magnum S&W revolver. Officers also discovered additional rounds of ammunition.

Police officers also interviewed Terry, who denied any involvement in the robbery. However, two days later, on September 18, 1998, May was interviewed and she admitted that she and Terry committed the robbery and that both of them were armed, at the time of the robbery, with the weapons found in the shed. She further confirmed that the two had used the money from the robbery to make the down-payment on the van; she explained that she was having financial problems and when she mentioned robbing a bank, Terry told her that it could be done and that he even knew of a good place to rob.

Before going to trial on charges stemming from the Credit Union robbery, Terry and May filed a motion to suppress the currency seized at their residence based on the allegation that the state search warrant did not authorize the seizure of the money. As recounted earlier, investigators, after obtaining a federal arrest warrant for Terry for the bank robbery, learned that a local drug task force had obtained a state search warrant for Terry's and May's residence. In part, the state search warrant authorized the search for and the seizure of:

Any substance of any color which purports to be cocaine or any of its derivatives; all paraphernalia of any kind, including, but not limited to, scales, packing material such as plastic bags and twist ties, and cutting agents, used for the manufacture or distribution of cocaine; all monies found in close proximity to the aforesaid items . . . .

Terry and May argued that because no cocaine was

discovered at their residence, the police were without the authority to seize the money and it should therefore be suppressed.

The judge rejected the defendants' argument, stating:

This court specifically finds that the officers investigating the credit union robbery would have sought the federal search warrant even if the currency had not been seized. The federal search warrant authorized a search of Terry's residence and the metal shed for evidence related to the Credit Union robbery, including "United States Currency which may have been taken in the robbery." The [money] would have been recovered in executing the federal search warrant. Accordingly, the federal search warrant supplied an independent source for the seizure of the money. This court finds that the [money] was "rediscovered" in a legal search supported by a valid search warrant, and the evidence need not be suppressed.

May and Terry were subsequently tried before separate juries, and during jury deliberations at the close of May's trial, the jury foreperson sent the following note to the trial judge:

We are having some problems. One of the jurors keeps mentioning "Have you ever had a .357 magnum put in your face." He said he had and it was scary. He never mentioned he was a victim of a crime. This is bothering other jurors.

The judge brought the note to the attention of both counsels and the following discussion occurred:

AUSA: I think the note is ambiguous, Your Honor. I mean, if there's a suggestion that somebody didn't tell the truth during jury qualification, I don't think that's accurate because it doesn't say--you could have a gun stuck in your face for a variety of reasons.

But, I think it's--

JUDGE:    That's true. You could have it in play.

AUSA: Right. In a shooting range.

JUDGE: Right.

AUSA: I mean, you wouldn't want someone sticking one in your face. And it doesn't say it's in the course of a crime.

JUDGE: Right.

AUSA: So, that suggestion, I think, is we don't know.

Even more fundamentally, this intrudes into the deliberative process of the jurors. . . . They've raised a concern. I think what we should do is say, "Thank you for your concern. Please continue deliberating."

They haven't raised any--they haven't asked for anything. They haven't said they are having difficulty, or this is impeding their ability to reach a verdict. I think we should acknowledge the fact that we've got their note, that we share their concern, and please continue deliberating. That would be my suggestion.

COURT: Mr. Schurter [defense counsel].

                    * * *

SCHURTER: I guess I would have to concur with [the

AUSA], though, in that I don't--it doesn't sound to me like it asks for any particular relief; and not knowing what they really had in mind, I suppose any gratuitous comments from the Court could be either helpful or harmful to either side. And so I, I don't know.
    I, I mean, I understand obviously it's not appropriate to have an ongoing conversation with the jurors by way of the notes. But, but we--on the defense side, we do have a serious concern if, if the, if the, if there is a juror in there who didn't answer the Court's questions truthfully and that's what they're saying, then we really are concerned.

COURT: The Court appreciates comments of counsel and believes that the appropriate way to handle it at this time is to, one, acknowledge the note and, two, to respond in a manner that the Court believes is appropriate, which, of course, is not to make any further inquiry into the note or in any way try to respond to the note. But the Court believes that a response of some type is appropriate.

So, the Court at this time has fashioned the following response. "To the jury: The Court has received your note. The Court believes you have all the instructions necessary for your deliberations on the verdicts in this case. Please continue your deliberations."

Any objections to that, . . . ?

AUSA: No, Your Honor.

COURT: Mr. Schurter?

SCHURTER: No, Your Honor.

(Emphasis added). The judge sent this note to the jury and, approximately thirty minutes later, the jurors returned a guilty verdict against May on all counts.

Approximately a week after May's trial, a separate jury also found Terry guilty on all counts charged. As mentioned before, the trial court then sentenced May to 147 months of confinement and Terry to life imprisonment. May and Terry appeal.

## II.  ISSUES

On appeal, we consider: 1) whether the district court erred in denying May's and Terry's motion to suppress the money found at their residence; and 2) whether the district court erred in allowing May's jury to continue its deliberations after receiving a note suggesting that a juror may have been a crime victim.

## III.  DISCUSSION

### A.  May's and Terry's Motion to Suppress

In reviewing a district court's decision on a motion to suppress, this court reviews the propriety of the search de novo, but we review all findings of historical fact and credibility determinations under the clear error standard. See United States v. Brown, 188 F.3d 860, 864 (7th Cir. 1999).

On appeal, the two defendants argue that the currency seized from their residence should be suppressed because the federal search warrant was a "direct result" of the illegal seizure of the currency pursuant to the state search warrant. In other words, Terry and May argue that the federal search warrant would never have been issued if not for the illegal seizure of the money, and therefore the currency should not have been admitted under the independent source doctrine. However, the appellants ignore the fact that federal law enforcement officials had a wealth of information concerning their involvement in the Credit Union robbery.

In United States v. Markling, 7 F.3d 1309, 1315 (7th Cir. 1993) (bold added), this court stated,

To understand the independent source doctrine, one must begin with the competing interests at stake when courts decide whether to exclude evidence on Fourth Amendment grounds. The

exclusionary rule is meant to deter illegal police conduct by punishing that conduct. Salgado, 807 F.2d at 607. The exclusionary rule attempts to accomplish this purpose by prohibiting the introduction of evidence obtained as the direct or indirect result of an illegal search. Murray, 487 U.S. at 536, 108 S. Ct. at 2532. The exclusionary rule thus deters illegal police conduct by removing the incentive for illegal conduct. But the exclusionary rule also involves significant social costs. The exclusionary rule deprives juries of probative evidence of a crime; and by depriving juries of probative evidence, the exclusionary rule often works at odds with society's interest in prosecuting and punishing crime. See Nix v. Williams, 467 U.S. 431, 442-43, 104 S. Ct. 2501, 2508, 81 L. Ed. 377 (1984). It is necessary to strike a balance between the competing interests. "The exclusionary rule is a sanction, and sanctions are supposed to be proportioned to the wrong-doing that they punish." Salgado, 807 F.2d 603 at 607.

The Supreme Court has determined that "'the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position than they would have been in if no police error or misconduct had occurred.'" Murray, 487 U.S. at 537, 108 S. Ct. at 2533 (quoting Nix, 467 U.S. at 443, 104 S. Ct. at 2509) (emphasis in Nix); see also Salgado, 807 F.2d at 607-08. Excluding evidence that the police ultimately obtained by independent legal means would not put the police in the same position they would have been in if they had not committed any illegal conduct; instead, it would put them in a worse position. Id. The independent source doctrine avoids this by allowing the introduction of evidence discovered initially during an unlawful search if the evidence is discovered later through a source that is untainted by the initial illegality. Id.

Under the independent source doctrine, if police discover items x and y during an illegal search, but later discover item z during an independent legal search, item z is admissible in evidence because it was derived from an independent source. Murray, 487 U.S. at 537-38, 108 S. Ct. at 2533. That was the situation in Segura. See 468 U.S. at 813-14, 104 S. Ct. at 3389. But the doctrine as stated in Murray goes further. At issue in Murray was evidence that agents seized from a warehouse pursuant to a warrant after the agents had previously observed the evidence during an illegal entry into the warehouse. See Murray, 487 U.S. at 535-36, 108 S. Ct. at 2532.

Under the independent source doctrine as stated in Murray, if during the untainted legal search police discover not only item z but also rediscover items x and y, x and y as well as z are admissible. Id. at 538, 108 S. Ct. at 2533; see also United States v. Herrold, 962 F.2d 1131, 1140 (3d Cir. 1992).

The reasoning behind the admission of evidence under the independent source doctrine is that although the police should not benefit from their unlawful conduct, neither should they be put in a worse position by excluding evidence that was later discovered or re-seized by independent legal means. See Murray, 487 U.S. at 537, 542 (citation omitted). Thus, the central question under the independent source doctrine is whether the evidence at issue was obtained by independent legal means.

In Markling, this court set forth a two-part test to determine whether the evidence was, in fact, obtained by independent lawful means: 1) whether the officer's decision to seek the warrant resulted from what he had seen (or, in this case, seized) during the unlawful search; and 2) whether the illegally obtained evidence caused the magistrate to issue the search warrant. See Markling, 7 F.3d at 1315-16. If the answer to both of these inquiries is no, then the evidence need not be suppressed despite the fact that it was initially unlawfully obtained.

Based on information obtained from Kenneth Faust and other sources, law enforcement knew the following facts: 1) Terry and May were both "broke" immediately before the Credit Union robbery but were now flush with money and suddenly had the means to put down $4000 on a van on the same afternoon of the robbery; 2) that some of the recorded "bait bills" were recovered from the money used to purchase the van; 3) Terry had a .357 magnum (the gun used in the Credit Union robbery) in the house several days before the robbery but police did not find it pursuant to the state authorized search; 4) Faust had told the police that Terry had a hat that was similar to one worn by the perpetrators but no such hat was recovered; 5) May and Terry fit the general description of the robbers given by the Credit Union employees; and 6) May and Terry had been identified as the perpetrators of the Credit Union robbery in separate anonymous tips.

These facts are certainly sufficient to establish the necessary basis for the issuance of a federal search warrant absent any reference to the $1186 discovered pursuant to the state search warrant. In this case, although the currency seized by the police was not covered by the state

search warrant, the federal search warrant, which was issued the next day, had an independent basis for seizure of the money. Given Faust's statements and the federal investigators extensive information concerning the robbery, we are of the opinion that the district court's finding that law enforcement officers would have sought a federal search warrant to search Terry's and May's residence, the shed, and any money found in either place, even without the seizure of the currency pursuant to the state search warrant, was not clearly erroneous. Thus, the cash was properly admitted under the independent source doctrine.

B.  The Note From the Jury in May's Trial

  May argues that she did not receive a fair trial by an impartial jury because the court allowed jury deliberations to continue after it received the note from the jury foreperson, which, according to May, suggested that one of the jurors was less than truthful during voir dire examination when asked whether he had ever been a victim of a crime. Therefore, according to May, she is entitled to a new trial under McDonough Power Equipment v. Greenwood, 464 U.S. 548, 556 (1984) ("We hold that to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial."). Because May failed to object, in fact defense counsel affirmatively supported the trial judge's decision to send the jury a note admonishing them to continue deliberations, we review her claim under the plain error standard. See Fed. R. Crim. P. 52(b); United States v. Davis, 15 F.3d 1393, 1407 (7th Cir. 1994).

  It is important to note that May's counsel never requested that the court take any action whatsoever with respect to the note. Instead, both counsel for May and for the government agreed with the trial court that the note from the jury foreperson was at best ambiguous and did not necessarily mean that any juror had been untruthful during voir dire. Furthermore, neither party requested a hearing to further explore the contents or meaning of the note, and the court did not find anything in the note sufficiently alarming to justify its holding a hearing sua sponte. Additionally, both counsels, after conferring with the court, affirmatively supported the trial judge's decision to send a

note to the jury telling them to continue deliberations.

When considering the totality of the information contained in the record, we are of the opinion that May has failed to establish that any juror failed to honestly answer a material question during jury selection. As the trial judge, the AUSA, and defense counsel acknowledged, there are numerous situations in which an individual may have a gun pointed at him or her that do not include being a victim of a crime. Based on the statement above and the fact that both counsels approved of the judge's handling of the matter, we refuse to hold that the judge committed plain error in responding to the jury's note as he did. We are also convinced that the district court did not commit plain error in failing to conduct a hearing sua sponte to explore the contents of the note in light of the fact that both parties agreed that the note was ambiguous.

The decision of the district court is

AFFIRMED.

/1 Count one charges Terry and May with the armed bank robbery of the Credit Union, in violation of 18 U.S.C. sec.sec. 2113(a), (d); Count two charges that the defendants used and carried a firearm during a crime of violence, in violation of 18 U.S.C. sec. 924(c)(1); and Counts 3 and 4 charge Terry and May, respectively, with being a felon in possession of a firearm, in violation of 18 U.S.C. sec.sec. 922(g) & 924(e)(1).

/2 On December 3, 1998, the trial judge granted the government's oral motion to sever the trials of the two defendants.

/3 May was sentenced to 87 months' imprisonment on both Counts one and four, to be served concurrently and concurrent with each other, and 60 months' imprisonment on Count two to be served consecutively to the 87 months. Additionally, May's supervised release was five years on Count one and three years on each of Counts two and four to be served concurrently.

/4 Terry was ordered to be confined for a term of life plus 60 months. Terry's sentence consisted of life on Count one and 327 months on Count three to be served concurrently and concurrent with each other, and 60 months on Count two to be served consecutively.

/5 Although Terry and May robbed the Champaign County Employees Credit Union they were charged

with armed bank robbery. We will therefore refer to the institution which they robbed interchangeably throughout the opinion as either the "Credit Union" or the bank.

/6 Winkleman told the probation officer that she is now scared to be at work alone and becomes frightened when the bank is not busy. She further stated that because of the robbery she has difficulty concentrating, sleeping, has nightmares, and has even considered changing careers.

/7 The "bait bills" consisted of thirty-five $20 bills which had been photocopied prior to being placed in the teller drawers to allow for later comparison in the event of a robbery.

/8 The detectives investigating the Credit Union robbery coordinated the execution of the federal arrest warrant for Terry with the execution of the state search warrant dealing with cocaine. At approximately 9:25 p.m., on September 16, 1998, members of the Champaign, Illinois, Police Department SWAT team entered Terry's and May's residence. Once the SWAT team secured the house, Terry was arrested and a multi-jurisdictional drug task force performed the search of the house.

/9 The federal search warrant was obtained in the early morning hours of September 17th and not only authorized the search of the shed behind his house, but also the money seized in the initial search of Terry's residence pursuant to the state search warrant.