**UNITED STATES of America,**

v.

**Gale NETTLES, Defendant.**

**No. 01 CR 0524.**

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 21, 2001.

Sean M. Berkowitz, United States Attorney's Office, Chicago, IL, for plaintiff.

Angela Frances Milella, Chicago, IL, for defendant.

## OPINION AND ORDER

NORGLE, District Judge.

Before the court is the motion of Defendant Gale Nettles to suppress evidence obtained from a search of his computer hard drives and printer. For the following reasons, the motion is denied.

### I. BACKGROUND

On October 23, 2000, a confidential informant told United States Secret Service Agents that a person later identified as Nettles had provided the informant with $350.00 in counterfeit United States $10.00 bills. Each of the counterfeit bills bore serial number F26724028E. Secret Service Agent Horox ("Horox") examined the bills and concluded that they were made with an ink jet color copier and/or an ink jet color printer. The informant agreed to arrange a meeting between Nettles and an undercover agent, where the agent was to purchase $1,000.00 in counterfeit money from Nettles.

On October 24, 2000 Nettles met with the undercover agent and confidential informant in a restaurant on the North side of Chicago. Nettles exchanged $1,000.00 in counterfeit United States $10.00 bills for $200.00 in genuine currency. Each of these bills also bore serial number F26724028E. Upon leaving the restaurant, Nettles was arrested and processed by Secret Service Agents. After the Secret Service processing, Nettles was turned over to the Illinois Department of Corrections as a possible parole violator.

At the time of his arrest, Nettles was living as a month to month tenant in a hotel on West Wilson Avenue in Chicago. On November 8, 2000, Horox spoke with the building's owner, Michael Siegel. Siegel told Horox that Nettles rented room 237 at the hotel, and that he had paid his rent through November. Siegel also said

that after learning of Nettles' arrest, Siegel caused Nettles' belongings, including several pieces of computer equipment, to be moved from room 237 to two storage rooms at the hotel. Horox also spoke to the hotel's desk clerk, Dale Bergst, who said that on October 30, 2000, he had moved Nettles' belongings from room 237 to two storage closets in the hotel. Bergst said that he had moved several pieces of computer equipment, one of which he believed to be a printer. The only evidence in the record concerning Siegel's and Bergst's motivation to move Nettles' property is an affidavit from Bergst, which states that Nettles' property was not secure in room 237 because of a nearby fire escape.

The two storage rooms to which Bergst had moved Nettles' property were shared storage rooms for the tenants of the hotel that were not open to the public. The hotel kept the rooms locked, and the only keys available were held by Siegel and the desk clerk on duty.[1] Hotel guests were allowed to store property in the rooms, but the only way to gain access to the rooms was through Siegel or the desk clerk.

On November 15, 2000, without a warrant, Horox and another agent went to the hotel and asked Siegel for permission to enter the storage rooms to examine Nettles' property. Siegel agreed, and opened the doors for the agents. The agents visually examined the exterior of Nettles' belongings, including three computers and two ink jet printers that Horox believed to be capable of producing counterfeit currency.

On November 17, 2000, Horox applied for a warrant to search the storage rooms at the hotel, seize Nettle's computer equipment, and search the computer hard drives and other aspects of the equipment. Ho-

rox's affidavit described the investigation into Nettles, including her entry into the storage rooms on November 15th. The affidavit also gave a detailed description of Nettles' computer equipment, such as the make and serial number of each piece. The Magistrate Judge issued the warrant, which the agents executed. Also on November 17th, Nettles was released from state custody.

Pursuant to the warrant, the Government searched Nettles' computer equipment. The search revealed that Nettles had on a hard drive an image of a $10.00 bill bearing serial number F24724072E. The Government also confirmed that Nettles had a printer consistent with the type of printer used to print the counterfeit bills that Nettles passed.

On June 6, 2001, Nettles was indicted on charges of forging and passing counterfeit United States currency. Nettles now moves to suppress the evidence obtained from the search of his computer hard drives and printer. Nettles argues that the agents' warrantless search of the storage rooms and Nettles' property on November 15th irretrievably taints the subsequent search pursuant to the November 17th warrant. The Government argues that the warrantless entry into the storage rooms is of no consequence because Nettles did not have a reasonable expectation of privacy in the storage rooms, and agents had the consent of the hotel owner to enter the rooms. Alternatively, the Government argues that the independent source doctrine applies to its search of Nettles' computer equipment under the November 17th warrant.

## II. DISCUSSION

The Fourth Amendment to the Constitution states:

---

**1.** Bergst is the only desk clerk working at the hotel of which the court is aware. The record is silent as to whether the hotel employs other desk clerks in addition to Bergst.

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The Fourth Amendment safeguards against searches or seizures that intrude upon a person's reasonable expectation of privacy. *See Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring); *United States v. Redmon,* 138 F.3d 1109, 1112–13 (7th Cir.1998) (citing *California v. Greenwood,* 486 U.S. 35, 39, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988)); *see also Sparing v. Olympia Fields,* 266 F.3d 684, 688–91 (7th Cir.2001) (analyzing a reasonable expectation of privacy in the context of a doorway arrest); *Siebert v. Severino,* 256 F.3d 648, 653–55 (7th Cir.2001) (analyzing a reasonable expectation of privacy in the context of a search of a barn). More precisely, the Fourth Amendment is implicated when a person has a subjective expectation of privacy that society accepts as objectively reasonable. *See Katz,* 389 U.S. at 361, 88 S.Ct. 507; *Redmon,* 138 F.3d at 1112 (quoting *Greenwood,* 486 U.S. at 39, 108 S.Ct. 1625); *but see Kyllo v. United States,* 533 U.S. 27, 121 S.Ct. 2038, 2043, 150 L.Ed.2d 94 (2001) (noting scholarly and judicial criticism of *Katz* ). In this case, several issues arise out of the transfer of Nettles' property from room 237 to the storage rooms, and the subsequent actions taken by Government agents. The court addresses each of these issues in turn.

## A. Moving Nettles' Property to the Storage Rooms:

██ The Fourth Amendment does not apply to Siegel's and Bergst's acts of entering Nettles' room and moving his property. "The Fourth Amendment 'is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.' " *United States v. Hall,* 142 F.3d 988, 993 (7th Cir.1998) (quoting *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984)). The Fourth Amendment does, however, govern the acts of private persons if they act as instruments or agents of the Government. *Hall,* 142 F.3d at 993. Nettles argues, in his reply brief, that Bergst's entry into Nettles' room was an illegal search done at the behest of Government agents, thereby implicating the Fourth Amendment. *See id.* Nettles offers no evidence to support this argument, as is his burden. *See e.g. id.* (discussing the court's inquiries into whether private parties were acting on behalf of the Government for the purposes of Fourth Amendment analysis) (citing *United States v. McAllister,* 18 F.3d 1412, 1417–18 (7th Cir.1994)). And, the assertion itself is contrary to the evidentiary proffer in Nettles' initial brief, which is that Bergst placed Nettles' property in the storage rooms because the property was at risk in Room 237. Absent from Bergst's affidavit is any reference to acting at the behest of the Government. The only reasonable inference to draw from the record is that Siegel and Bergst were not acting on behalf of the Government when they entered Nettles' room and moved his property. Accordingly, the court finds that the Fourth Amendment does not apply to the actions of Siegel and Bergst.

## B. Reasonable Expectation of Privacy in the Storage Rooms and the Property Therein:

██ Nettles argues that he had a privacy interest in both storage rooms and that he retained a privacy interest in his prop-

erty despite its placement in the storage rooms. The Government's position is Nettles cannot have a reasonable expectation of privacy in the storage rooms because the rooms were shared by hotel guests, and access to the rooms was controlled by hotel management.

As discussed above, the Fourth Amendment safeguards against searches or seizures that intrude upon a subjective expectation of privacy that is objectively reasonable. *See Katz,* 389 U.S. at 361, 88 S.Ct. 507; *Redmon,* 138 F.3d at 1112–13. Generally speaking, there is no reasonable expectation of privacy in common or shared areas of multiple dwelling buildings. *See e.g. United States v. Concepcion,* 942 F.2d 1170, 1171–72 (7th Cir. 1991) (collecting authority); *United States v. Barrios–Moriera,* 872 F.2d 12, 14–15 (2nd Cir.1989), *abrogated on other grounds, Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). This is so even where the common areas are otherwise locked to exclude persons that are not tenants of the buildings. *See Concepcion,* 942 F.2d at 1171–72; *Barrios–Moriera,* 872 F.2d at 14–15; *see also United States v. Espinoza,* 256 F.3d 718, 723 (7th Cir.2001) (dicta noting "the principle that tenants lack a legitimate expectation of privacy in the common areas of multi-family buildings, because landlords and co-tenants are free to admit strangers."); *but see United States v. Salgado,* 250 F.3d 438, 456 n. 3 (6th Cir.2001) (noting a split of authority between the Seventh Circuit and the Sixth Circuit on the issue of a reasonable expectation of privacy in locked common areas of an apartment complex) (citing *United States v. Carriger,* 541 F.2d 545 (6th Cir. 1976)). Most of these cases arise in the context of police officers being present in hallways or vestibules of apartment buildings. *See e.g. Concepcion,* 942 F.2d at 1171–72; *Barrios–Moriera,* 872 F.2d at 14–15; *United States v. Acevedo,* 627 F.2d 68, 69 n. 1 (7th Cir.1980). The case at bar is distinguishable, in that Nettles' property was located in locked storage rooms, rather than in a high traffic hallway, gangway or vestibule. As discussed below, however, this distinction does not afford Nettles a reasonable expectation of privacy in the storage rooms.

A cornerstone of the objective privacy inquiry is whether the object of a search was exposed to public view. *See e.g. Sparing,* 266 F.3d at 689 (noting that privacy claims are untenable when a person has exposed himself or his property to public viewing) (citing *United States v. Santana,* 427 U.S. 38, 42, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976) and *Katz,* 389 U.S. at 351, 88 S.Ct. 507). For example, in *Concepcion,* the Seventh Circuit rejected the notion that Mr. Concepcion could have an expectation that activities in the common areas of his apartment building would remain his secret. *See* 942 F.2d at 1172; *see also Acevedo,* 627 F.2d at 69 n. 1 (noting that a tear in paper covering the inside of a window indicated no expectation that persons passing by the window would refrain from looking inside). In this case, the storage rooms are shared by the tenants of the hotel, but the only access to the rooms is through either the hotel's owner, Siegel, or the desk clerk. While the interiors of the storage rooms are not as exposed to public view as a hallway is, they are frequented by hotel employees and any tenant storing items in the rooms. Presumably, tenants using the rooms could bring along other persons to help with moving items in and out of the storage rooms. Given this degree of access to the inside of the storage rooms, Nettles cannot have a reasonable expectation that the exterior viewable aspects of his property in those rooms would remain his secret. *See Espinoza,* 256 F.3d at 723; *Concepcion,* 942 F.2d at 1172.

It bears emphasis that the Government's warrantless viewing of Nettles' computer equipment was limited to a visual examination of the *exterior* of that equipment, and did not involve the retrieval of any information from within the computers. People use personal computers for many types of activities that they may intend to keep secret. Such information is contained within the computer, and is not retrievable through a visual examination of the computer's exterior. The information within a computer is not discernible by looking at its exterior surface. In this respect, the Government's warrantless examination of the exterior of Nettles' computer equipment is analogous to a visual examination of the exterior of a briefcase, purse, or other personal container. When such items are in a public place, viewing their exterior does not infringe on any reasonable privacy interest, and does not run afoul of the Fourth Amendment. *See United States v. McDonald,* 100 F.3d 1320, 1324–27 (7th Cir.1996) (analyzing the privacy interests in the exterior of personal luggage); *United States v. Fultz,* 146 F.3d 1102, 1105 (9th Cir.1998) (discussing the privacy interests people have in containers in which they store their personal belongings); *cf. Kyllo,* 121 S.Ct. at 2042–43 (noting that a reasonable expectation of privacy is a sine qua non of a Fourth Amendment search); *Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 1153–54, 94 L.Ed.2d 347 (1987) (discussing the plain view doctrine). Granted, Nettles did not voluntarily expose the exterior of his property to public view. Siegel and Bergst did that for him, but they are private citizens, and their actions do not implicate the Fourth Amendment. *Hall,* 142 F.3d at 993.

Nettles argues that the storage closets are part of his home, and are therefore subject to the protections of the Fourth Amendment. *See e.g. Sparing,* 266 F.3d at 688–91 (discussing the privacy interest in the home that pervades Fourth Amendment jurisprudence). The court is not persuaded by this argument. As discussed above, many different persons had access to the storage closets and the items stored therein. Hotel staff, tenants, and others could enter the storage rooms to place and retrieve belongings. Access to the storage rooms was controlled by hotel staff, not Nettles. Anybody who entered the rooms could view the exterior of anything that was placed in the rooms. With that level of access, the storage rooms are more akin to a common hallway than to a personally rented storage space, which would retain a higher expectation of privacy. *See Espinoza,* 256 F.3d at 723; *Concepcion,* 942 F.2d at 1171–72; *Barrios-Moriera,* 872 F.2d at 14–15; *Acevedo,* 627 F.2d at 69 n. 1; *compare United States v. Karo,* 468 U.S. 705, 104 S.Ct. 3296, 3306 n. 6, 82 L.Ed.2d 530 (1984) (noting that a person would have a reasonable expectation of privacy in their own storage locker).

Finally, Nettles argues that he retained a privacy interest in his property despite its placement in the storage rooms. In other words, Nettles claims that even if the Government did not need a warrant to enter the storage rooms, it needed a warrant to make a visual examination of the exterior of his property while it sat in the storage rooms. This argument is at odds with the well established law that the Fourth Amendment does not require a warrant to search something that is in a public place. *See Kyllo,* 121 S.Ct. at 2042–43;*Hicks,* 107 S.Ct. at 1153–54. The Government did not need a warrant to examine the exterior of Nettles' computer equipment because that equipment was located in common storage rooms, areas in which Nettles did not have a reasonable expectation of privacy.

## C. Consent:

■ The Government argues that Siegel and Bergst, as the controllers of access to the storage rooms, could properly give consent to search the rooms and any property therein. Nettles counters that as of November 15, 2000, the Government knew of Nettles' pending release from state custody. Assuming the Government knew that Nettles would return to the hotel and claim his property, Nettles argues it was unreasonable for the Government to believe that Siegel and/or Bergst could consent to a search of Nettles' property in the storage rooms.

The argument over consent is unnecessary, again because Nettles did not have a reasonable expectation of privacy in the storage rooms, nor did he have one in the exterior of his computer equipment while it was in the storage rooms. Indeed, it is almost a non-sequitur to argue about consent to search something that is exposed to public view. *See e.g. Kyllo,* 121 S.Ct. at 2042–43;*Hicks,* 107 S.Ct. at 1153–54.

Nevertheless, if it were necessary for the court to address consent, it would find that Siegel and/or Bergst properly consented to the Government's search of the storage rooms. Plainly, Siegel and Bergst, who controlled all access to the storage rooms, could properly give consent to enter the storage rooms. *See e.g. Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (noting that a search pursuant to valid consent does not violate the Fourth Amendment). And once Government agents were lawfully inside the storage rooms, in which Nettles did not have a reasonable expectation of privacy, they could examine the exterior of Nettles' property without a warrant. *See Fultz,* 146 F.3d at 1105; *McDonald,* 100 F.3d at 1324–27; *see also Kyllo,* 121 S.Ct. at 2042–43 (no Fourth Amendment violation absent a reasonable expectation of privacy); *contrast Hicks,* 107 S.Ct. at 1151–55 (analyzing a warrantless search conducted in a home).

## D. Independent Source Doctrine:

■ Alternatively, the Government argues that even if the initial warrantless examination was improper, the subsequent search of the information on Nettles' computer equipment was proper because it was supported by a valid warrant issued independently of anything learned during the warrantless entry into the storage rooms. Nettles counters that the Government's argument is incorrect because some information Government agents collected during the warrantless search was included in the warrant application. The court does not believe this inquiry is necessary because Nettles did not have a reasonable expectation of privacy in the storage rooms or the exterior of his property located therein. (*See* supra pp. 1092–94.) Nevertheless, out of an abundance of caution, the court also analyzes the independent source doctrine, and finds that it would apply if the Government's warrantless actions violated the Fourth Amendment.

When the Fourth Amendment applies, a search or seizure is "generally considered unreasonable unless the government obtains a warrant issued upon probable cause." *United States v. Basinski,* 226 F.3d 829, 833 (7th Cir.2000). This general proposition is subject to numerous exceptions, including the independent source doctrine. The independent source doctrine traces its beginning to *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), where Justice Holmes wrote that the Fourth Amendment forbids the Government from using information obtained during an illegal search, but does not forever bar that information from admission at trial:

The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others....

*Id.* at 392, 40 S.Ct. 182.

The Supreme Court's most recent analysis of the independent source doctrine came in the case of *Murray v. United States,* 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988). Since the *Murray* decision, the Seventh Circuit has had several opportunities to analyze and discuss the independent source doctrine. *See e.g. United States v. May,* 214 F.3d 900 (7th Cir.2000); *United States v. Hall,* 142 F.3d 988 (7th Cir.1998); *United States v. Gravens,* 129 F.3d 974 (7th Cir.1997); *United States v. Liss,* 103 F.3d 617 (7th Cir.1997); *United States v. Clemens,* 58 F.3d 318 (7th Cir.1995); *United States v. Markling,* 7 F.3d 1309 (7th Cir.1993); *United States v. Johnston,* 876 F.2d 589 (7th Cir.1989).

In *Markling,* the Seventh Circuit provided a thorough analysis and history of the independent source doctrine. *Markling,* 7 F.3d at 1315–18. Independent source analysis focuses on the competing interests at stake in deciding whether to exclude evidence on Fourth Amendment grounds. *Id.* at 1315. The purpose of the exclusionary rule is to deter police misconduct by prohibiting the introduction of evidence obtained in violation of the Fourth Amendment. *Id.* (citing *Murray,* 487 U.S. at 536, 108 S.Ct. 2529 and *United States v. Salgado,* 807 F.2d 603, 607 (7th Cir.1986)). The exclusionary rule, however, exacts a significant societal cost by depriving juries of probative evidence of crimes, and is in tension with the public's interest in detecting and punishing criminal behavior.

*Markling,* 7 F.3d at 1315. The independent source doctrine is a means of balancing these competing interests. *See id.*

> [T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position than they would have been in if no police error or misconduct had occurred.... When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been absent any error or violation.

*Murray,* 487 U.S. at 537, 108 S.Ct. 2529 (quoting *Nix v. Williams,* 467 U.S. 431, 443, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984)).

To balance these interests and determine whether challenged evidence truly has an independent source, the court must conduct two inquiries. *See Markling,* 7 F.3d at 1315–16. First, was the magistrate's decision to issue the warrant affected by, or in reliance on, information obtained from an illegal search? *Markling,* 7 F.3d at 1315–16; *United States v. Herrold,* 962 F.2d 1131, 1141–44 (3rd Cir. 1992). Second, was the officer's decision to seek a warrant prompted by what he had seen during the illegal search? *Markling,* 7 F.3d at 1315–16. The second question is often re-worded as "would the officer have sought the warrant regardless of the illegal search?" *See Murray,* 487 U.S. at 543, 108 S.Ct. 2529; *Markling,* 7 F.3d at 1315–16. If the answers to these questions are such that the magistrate did not rely on information found in an illegal search, and the officer's illegal search did not prompt the decision to obtain a warrant, then the challenged evidence has an independent source, and is admissible at trial. *See Murray,* 487 U.S. at 542, 108 S.Ct. 2529. The reason is that excluding

evidence that has a source independent of any police error or illegality would put the police in a worse position than they would have been without the error or illegality. *See id.* at 537, 108 S.Ct. 2529; *see also United States v. Terzado–Madruga,* 897 F.2d 1099, 1115 (11th Cir.1990) (noting that in an independent source case, "there is no reason to exclude the challenged evidence since the police misconduct is not even a 'but for' cause of its discovery.")

Thus, the first issue is whether the magistrate judge issued the November 17th warrant based on information learned from the warrantless November 15th entry into the storage rooms. To make the determination, the court is to decide whether probable cause exists after removing from the warrant application any information learned during the warrantless examination of the exterior of Nettles' computer equipment. *See Markling,* 7 F.3d at 1316–17. Horox's warrant application included such information, namely, a detailed description of Nettles' computer equipment and Horox's conclusion that Nettles' printers were capable of producing the counterfeit bills that Nettles passed. As discussed below, after removing this information from the warrant application, probable cause to seize and search the equipment still exists.

Probable cause depends on the totality of the facts and circumstances at hand, and will be found where an officer has reasonably trustworthy information sufficient to justify a prudent person to believe that the suspect has committed, is committing, or is about to commit an offense. *See United States v. Sawyer,* 224 F.3d 675, 678–79 (7th Cir.2000). "Probable cause, however, does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." *Id.* Indeed, probable cause is *less* than a more likely than not test, "but how much less will

depend on the circumstances ... including the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Spiegel v. Cortese,* 196 F.3d 717, 724 n. 1 (7th Cir.1999) (emphasis added). When the court is to determine probable cause from an affidavit, the court is not to engage in a hypertechnical reading of the affidavit. *United States v. Wilson,* 169 F.3d 418, 422–23 (7th Cir.1999). Instead, the court is to evaluate the totality of the information found in the affidavit, and "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.*

The warrant application in this case was supported by Horox's 19 paragraph affidavit outlining the investigation into Nettles. Even without the information Horox learned from the warrantless entry into the storage rooms, the affidavit provides a sufficient factual basis to establish probable cause that Nettles' computer equipment held evidence of counterfeiting. Horox's affidavit detailed: (1) the confidential source stating that he/she had purchased counterfeit $10.00 bills bearing serial number F26724028E from Nettles; (2) the confidential source arranging and attending the October 24, 2000 meeting at the restaurant where Nettles sold $1,000.00 in counterfeit $10.00 bills bearing serial number F267724028E to the undercover agent; (3) Horox's inspection of the counterfeit bills and conclusion that the bills were printed by an ink jet printer or an ink jet copier; and (4) Horox's conversations with Siegel and Bergst, where they told Horox about Nettles' computer equipment and their moving the equipment to the storage rooms. Nettles was arrested for passing counterfeit money, which Horox believed to have been printed on an ink jet printer

or ink jet copier. During the Government's follow up investigation, it learned from Siegel and Bergst that Nettles had computer equipment, which they believed to include a printer. These facts raise the inference that Nettles had the capacity to forge the counterfeit bills that he was selling to undercover agents and confidential informants. The facts and inferences drawn from the facts are sufficient to find probable cause to issue a warrant to seize and search Nettles' computer equipment for evidence of forging counterfeit bills. *See Sawyer,* 224 F.3d at 678–79 (noting that probable cause does not even require evidence that it is more likely than not that the suspect committed a crime).

This is not a case where Horox's detailed description of Nettles' computer equipment played any material role in finding probable cause, as would occur if Nettles had been under suspicion of dealing in stolen goods. *Cf. Hicks,* 107 S.Ct. at 1151–55 (analyzing a search that revealed the serial numbers of stolen stereo equipment). This case is about counterfeiting, and the Government learned via lawful means that Nettles was passing counterfeit bills that appeared to have been printed on a run of the mill ink jet printer or copier. After learning through lawful means that Nettles possessed computer equipment, including a printer, the Government sought and obtained a warrant to search the information contained within that computer equipment. The Government's initial warrantless viewing of the exterior of Nettles' equipment was irrelevant to the probable cause determination, because there was nothing about the exterior of that equipment that could give any clue as to the type of information stored within. Therefore, the warrant was not based on any illegally obtained information.

Similarly, the second or motivational prong of *Murray* also supports the Government's position. *Murray's* motivational inquiry is aimed at the so-called "confirmatory search," where officers conduct an illegal search to see if there is anything worth the trouble of getting a warrant. *See Murray,* 487 U.S. at 540 n. 2, 108 S.Ct. 2529 (noting that officers may have misjudged the circumstances, but "there [was] nothing to suggest that they went in merely to see if there was anything worth getting a warrant for."); *United States v. Pena,* 924 F.Supp. 1239, 1256 (D.Mass. 1996) (describing a confirmatory search as one where "officers conduct an initial warrantless search to determine whether they would uncover evidence worth the trouble of obtaining a warrant."); LaFave, *Search and Seizure: A Treatise on the Fourth Amendment,* § 11.4(f) at 299–303 (3rd ed.1996) (discussing the motivational prong of *Murray* ). Nettles asserts that the initial warrantless examination was a confirmatory search, but the facts do not support that conclusion. A confirmatory search may have occurred if the Government had searched the hard drives of Nettles' computers prior to seeking the warrant. But it did not do so. The Government engaged in a lawful investigation of Nettles, where it learned: (1) Nettles was passing counterfeit money; (2) the counterfeit money that Nettles passed was printed on an ink jet printer or copier; and (3) Nettles owned computer equipment, including a printer. These facts provided ample motivation for the Government to seek a warrant to search Nettles' computer equipment for further evidence of counterfeiting. There is nothing in the record to support the conclusion that the initial warrantless viewing of the exterior of Nettles' computer equipment prompted the Government to seek a warrant to search the hard drives of those computers. The Government sought and obtained judicial approval for their search of Nettles' hard drives, which was prompted by their lawful ongoing investigation rather than

their warrantless examination of the exterior of Nettles' computer equipment while it was in the storage rooms.

## III. CONCLUSION

For the foregoing reasons, Nettles' motion to suppress is denied.

IT IS SO ORDERED.