In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-3924

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ANDRE MOODY,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Indiana, Terre Haute Division.
No. 09 CR 00009—**William T. Lawrence,** *Judge.*

ARGUED SEPTEMBER 22, 2011—DECIDED DECEMBER 14, 2011

Before BAUER, MANION, and KANNE, *Circuit Judges.*

MANION, *Circuit Judge.* A jury convicted Andre Moody of one count of conspiracy to distribute 500 grams or more of methamphetamine, and one count of distribution of five grams or more of methamphetamine. The district court sentenced Moody to 292 months' imprisonment for each count, set to run concurrently. Moody

appeals, arguing that the district court erred in admitting evidence obtained in violation of his constitutional rights. We conclude that the challenged evidence was derived from an independent source, and in light of the fact that law enforcement did nothing with the challenged evidence for over two years before it was rediscovered by an independent source, any unconstitutional taint was removed and the evidence was properly admitted. We affirm.

I.

Law enforcement officials first learned of Moody's methamphetamine trafficking in November 2007 from an informant, Misty Sutton. Moody had begun "fronting" quantities of methamphetamine to Sutton approximately four months prior to her arrest, and she in turn sold the methamphetamine to individual users. Working with law enforcement, on November 24, 2007, Sutton made a series of telephone calls and texts to Moody to request more methamphetamine, and she arranged to meet him to complete the transaction. Law enforcement officials stopped Moody on his way to meet with Sutton, and a trained narcotics dog alerted officers to the presence of a controlled substance in Moody's truck.

After the dog alerted to the presence of drugs, Moody gave Detective Terry Rogers oral consent to search his vehicle. Rogers's search uncovered a quantity of

methamphetamine, $991 in cash, and two cell phones. Rogers arrested Moody, and following the arrest he searched the electronic memory of the cell phones and found a list of numbers that had recently contacted Moody's phone. One of the numbers was identified in the phone's memory with the letter "G." As a result of this stop, Moody was convicted of possession of methamphetamine and was sentenced to probation. Nothing further was done with the information obtained from Moody's cell phone.

His arrest and conviction did nothing to deter his interest in drug trafficking, however, as Moody wasted no time after his release in contacting his associates and in continuing to supply them with methamphetamine. Testimony at trial revealed that Moody regularly provided methamphetamine to Donald Blair from December 2007 through September 2008, who in turn delivered that methamphetamine to James Nichols, Robin Pegg, David Pegg, and Norman Auterson. Police eventually developed Blair as an informant, and in May 2009, observed Blair and Moody engaging in a variety of transactions related to Moody's drug trafficking.

On May 27, 2009, Blair, cooperating with law enforcement officials, undertook to execute a controlled purchase of methamphetamine from Moody. Law enforcement placed audio/video recording devices in Blair's kitchen and living room, and Blair himself was outfitted with an audio/video recording device. While Moody was at Blair's apartment and under the surveillance of officers, Moody received a call on his cell phone from a

man later identified as Moody's methamphetamine source. At trial, Blair testified that Moody indicated during the phone conversation that he would leave Blair's apartment to meet his methamphetamine source and resupply. After Moody left, Blair informed the police of the substance of the conversation.

Surveillance officers followed Moody as he drove from Blair's apartment to a truck stop in Terre Haute, Indiana. They observed a blue vehicle pull up beside Moody's truck. A Hispanic male (later identified as Gonzalo Gutierrez) left the blue vehicle and entered Moody's truck. He remained in Moody's truck for approximately two minutes and then returned to his vehicle and drove away from the truck stop. Officers followed both Moody and Gutierrez, and after driving towards Indianapolis for a time, an Indiana State Police officer stopped Gutierrez for speeding. Gutierrez was arrested and his vehicle was impounded. During the inventory search of the vehicle, officers found $6,290 in cash and a cell phone. Some of the currency seized from Gutierrez's vehicle matched the currency Blair had delivered to Moody earlier that day.

Officers also followed Moody, who returned to Blair's apartment. The audio/video recording devices placed in Blair's apartment captured Moody separating a large amount of methamphetamine into one-ounce quantities and packaging them into individual bags. Moody delivered one and one-eighth ounces of methamphetamine to Blair, which was also captured on

video. Moody then gathered up the remaining metham-phetamine and left the residence. Several days later, and under the supervision of law enforcement, Blair went to Moody's residence to deliver $1,350 in cash to pay down some of his methamphetamine debt. While there, Moody summarized the series of metham-phetamine transactions between Moody and Blair that had given rise to Blair's debt.

After Gutierrez and Moody were arrested, Special Agent Douglas Freyberger of the Drug Enforcement Administration subpoenaed Moody's and Gutierrez's cell phone records. After reviewing these records, investigators were able to determine that the telephone number of "G" which Detective Rogers found when searching Moody's cell phone after his first arrest in 2007 corresponded to Gutierrez's cell phone number. The subpoenas further revealed that Moody had extensive contacts with Gutierrez, Blair, Sutton, and others involved in his distribution ring from 2007 through 2009. At trial, the government presented evidence of both the information discovered from the subpoena, as well as Rogers's testimony that when Moody was first arrested during the 2007 traffic stop, that the search of the cellphone showed a recent call from "G." Moody did not seek to suppress the cell phone evidence prior to trial, and did not object at trial to the admission of the evidence. Now on appeal, Moody challenges for the first time his convic-tion based on the admission of the cell phone evidence.

## II.

Moody did not file a motion to suppress the admission of the cell phone evidence prior to trial, nor did he object when that evidence was introduced at trial; his claim is thus forfeited and we review admission of the evidence for plain error. *United States v. Olano*, 507 U.S. 725, 734 (1993). A defendant may prevail on a forfeited claim if he can show: (1) an error has occurred; (2) it was "plain"; and (3) it affected his substantial rights. *Id.* at 733-34 (1993); *see also United States v. Tanner*, 628 F.3d 890, 898 (7th Cir. 2010). When (as here) the defendant has forfeited his claim, "the 'plainness' inquiry must look to the error's certainty from the perspective of the appellate court", and it must be "clear and uncontroverted at the time of appeal." *United States v. Ross*, 77 F.3d 1525, 1539 (7th Cir. 1996). Reversal on the basis of plain error review is " 'justified only when the reviewing court is convinced that it is necessary in order to avert an actual miscarriage of justice.' " *United States v. D'Iguillont*, 979 F.2d 612, 614 (7th Cir. 1992) (quoting *United States v. White*, 903 F.2d 457, 466-67 (7th Cir. 1990)).

Moody argues that the introduction of the evidence obtained from the warrantless search of his cell phone incident to his first arrest in November of 2007 constituted plain error because that evidence was the fruit of an illegal search under the Fourth Amendment. He further argues that because this evidence was the linchpin on which the government made its case for

Moody's involvement in a large methamphetamine distribution conspiracy, all evidence derived from this initial illegal search must be suppressed, his conviction and sentenced should be overturned, and he should be granted a new trial.[1] We decline to consider the legality of Detective Rogers's search of Moody's cell phone because, as we discuss below, even if we were to question the legality of the search, the evidence recovered in the initial search was ignored until later discovered by an independent source—the subpoenaed cell phone records—over two years after the initial search, thus freeing it from any taint that would require its exclusion at trial.

The Supreme Court has ruled that "the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position than they would have been in if no police error or misconduct had occurred." *Murray v. United States*, 487 U.S. 533, 537 (1988) (*quoting Nix v. Williams*, 467 U.S. 431, 443 (1984)). " 'Excluding evidence that the police ultimately obtained by independent legal means would not put the police in the same position they would have been

---

[1] Moody does not contest his conviction for methamphetamine distribution, but does argue that his lengthy sentence for that charge (292 months' incarceration) was the result of the court being influenced by the conspiracy charge.

in if they had not committed any illegal conduct; instead, it would put them in a worse position.'" *United States v. May*, 214 F.3d 900, 906 (7th Cir. 2000) (citing *Murray*, 487 U.S. at 537). To avoid this, the independent source doctrine allows the admission of "evidence initially discovered during an unlawful search if the evidence was discovered later through a source untainted by the initial illegality." *United States v. Gonzalez*, 555 F.3d 579, 581 (7th Cir. 2009). "Thus, the central question under the independent source doctrine is whether the evidence at issue was obtained by independent legal means." *May*, 214 F.3d at 906.

In *United States v. Markling*, this court devised a two-part inquiry to determine whether evidence has been obtained by independent legal means: (1) whether an officer's decision to seek a warrant (or in this case, a subpoena) resulted from what he had seen during the unlawful search; and (2) whether the illegally obtained evidence caused the magistrate to issue the warrant. *United States v. Markling*, 7 F.3d 1309, 1315-16 (7th Cir. 1993); *see also May*, 214 F.3d at 906; *Gonzalez*, 555 F.3d at 581.

Here, there is no indication that Detective Rogers's search of Moody's cell phone in 2007 had any bearing on the DEA's decision to subpoena Moody's and Gutierrez's cell phone records in 2009. On the contrary, the record shows that law enforcement officials did precisely nothing with the information gleaned from Moody's cell phone in 2007. Officials did not connect

"G" to Moody's case until 2009, when, under heavy surveillance, Gutierrez met with Moody to deliver methamphetamine and was subsequently arrested. Prior to that meeting, there is no indication that law enforcement was even aware of Gutierrez's existence, let alone that they had used the information obtained by Detective Rogers in 2007 to build a conspiracy case against Moody. Only after Gutierrez was observed meeting with Moody—and was then arrested with a large amount of cash in his vehicle, some of which matched the cash that Blair had provided to Moody prior to Moody's meeting with Gutierrez—did law enforcement become aware of the connection between Moody and Gutierrez.

These facts are sufficient to establish the necessary basis to subpoena cell phone records, and they were derived entirely independent of the search of Moody's cell phone in 2007. This is more than adequate to satisfy the requirements of *Markling*. Even if Moody's cell phone had not been searched in 2007, law enforcement still would have arrested Moody and Gutierrez after observing their meeting at the truck stop in 2009. Following their arrest, law enforcement would have subpoenaed their cell phone records as part of the normal course of proceedings to build a case against Moody and Gutierrez, which they did here. The records showed not only the calls made in 2009, but also the calls made in 2007 that were initially uncovered by Detective Rogers's search. From these legally obtained records, investigators were able to trace

the full extent of the relationship between Moody and Gutierrez, and establish that they were involved in a continuing methamphetamine conspiracy for over two years.

In light of these considerations, and given the significant amount of audio/video recordings used to convict Moody of conspiracy to distribute methamphetamine, Moody's argument that the warrantless search of his cell phone in 2007 formed the linchpin of the government's conspiracy case against him is simply untenable. Thus, under the independent source doctrine, even if the 2007 search were illegal, evidence of Moody's conspiracy with Gutierrez was subsequently discovered lawfully, and therefore properly admitted.

III.

Moody's attempt to characterize his conspiracy conviction as the result of evidence obtained illegally is unavailing. Even if we had questioned the legality of the warrantless search of Moody's cell phone in 2007, the evidence derived therefrom was properly admitted during Moody's trial because of the independent source doctrine. When law enforcement officers subpoenaed Moody's and Gutierrez's cell phone records in 2009, they did so lawfully and entirely independent from any information gleaned from the initial search of Moody's cell phone in 2007, thus clearing the evidence of any taint. For those reasons, we find no plain error

in the district court's decision to admit the evidence. Moody's conviction and sentence are AFFIRMED.